ALBRECHT, Respondent, vs. CHICAGO & NORTHWESTERN RAILWAY COMPANY, Appellant.

*December 10, 1900 — January 8, 1901.*

*Railroads: Injury to fireman: Assumption of risk: Reliance upon engineer's promise to remove danger.*

1. As a locomotive was backed out of the roundhouse the fireman, who had never before made a trip on that particular engine, called the engineer's attention to the absence of the proper metallic shield on

Albrecht vs. Chicago & Northwestern R. Co.

the indicator glass of the lubricator, telling him he must get a shield, and the engineer promised to do so. The place to procure a shield was at the roundhouse. The fireman knew fully the danger of leaving the glass unguarded. The engine did not start on its trip until about two hours later, during which time it was located at some distance from the roundhouse, and the fireman was with it, working about the cab, with every opportunity to observe whether the shield was put in place or not; and when the engine started on its trip he must have known that the glass was still unguarded. About three hours later, during the trip, the glass exploded, causing injury to the fireman. *Held*, that he had assumed the risk. The reasonable time during which, if at all, he might continue in the service upon the faith of the engineer's promise to procure the shield, expired when the engine started on its trip.

2. Whether in such case the engineer stood in the master's place in respect to guarding the glass so as to provide a reasonably safe place in which the fireman might work, so that the fireman had a right to continue at work upon the faith of the engineer's promise, is considered but not decided.

APPEAL from a judgment of the superior court of Milwaukee county: J. C. LUDWIG, Judge. *Reversed.*

Action for personal injuries. The wrong complained of was negligence of the defendant in failing to furnish plaintiff a reasonably safe place to work. Plaintiff was a locomotive fireman. The defect in his working place was absence of a metallic shield commonly placed in front of the indicator glass on the appliance for supplying the steam cylinders of the engine with oil. The appliance was located conspicuously in the engine cab so that the occupants thereof could see by observation, at any time when the indicator glass was exposed to view, whether it was supplied with oil and whether oil was regularly and properly flowing from the magazine to the steam cylinders. The mechanism of the appliance, the connections between it and the steam boiler, its location and operation, so far as relates to this case, were substantially as follows:

There was a cylinder about five inches in diameter and six inches high, on top of which was a small expansion

chamber about four inches high, with a connection between the two. In the bottom of the cylinder was a connection about two inches in length furnished with a stopcock, so that when the device, by means of such connection, was attached to the boiler, steam could be made to pass through such connection to the cylinder or not, it being governed by the stopcock. The passage of steam into the cylinder was necessary to the operation of the device. The steam created a pressure therein equal to the pressure in the boiler. In front of the cylinder near the top was an aperture for charging such cylinder with oil, the aperture being closed by a plug. At the sides of the cylinder were two glass tubes, each about one half inch in diameter and one and one-half inches long, connected with the cylinder substantially in the manner water indicator glasses are connected with a steam boiler. Such glass tubes were protected from being broken by force from without, and, in case of their being broken by force from within, the flying of glass and other substances imperiling the personal safety of the occupants of the cab was prevented, by shields, completely encircling them, consisting of metallic strips about one fourth of an inch wide, placed about one fourth of an inch apart and one half inch from the glass. When the device was in operation oil passed from the cylinder or oil magazine through the side indicator glasses in drops in reaching the steam cylinders. By observing the side glasses one could readily see whether the device was operating properly. In front of the oil magazine was located a glass tube about four inches long and one half inch in diameter, attached to and connected with the cylinder in the same manner as a steam boiler indicator glass, its purpose being to enable an observer to see whether the cylinder was supplied with oil and the amount thereof, as before stated. There was commonly placed in front of the glass a metallic plate held in place by slots into which the ends were inserted, the plate

being bent so that when in position with the concave side toward the glass it would pass in front thereof about half way around on each side and be about one half of an inch from the glass. The purpose of the shield was to protect the glass from force from without, and, in case of its bursting from any cause, to prevent pieces thereof or other substances thereby released from imperiling the personal safety of the occupants of the cab. There was no way of observing the glass, to determine whether the device was supplied with oil, without removing the shield by the hand. A simple movement only was necessary for that purpose. It required but an instant to remove the shield and replace it after taking an observation. The entire length of the device was about fourteen inches. It was attached to the boiler at the top and just in front of the cylinder head, the point of attachment being about one foot above the head of a person of plaintiff's height as he stood upright on the cab floor.

On the occasion of plaintiff's injury there was no shield on the large indicator glass. The glass was well recognized as a part liable to break at any time, and liable to stand use for a long period of time without breaking, though the probability of its breaking with dangerous consequences to the occupants of the cab in case of a shield not being in place was such that such a protection was recognized as required by reasonable prudence. Plaintiff was fully acquainted with the dangers mentioned. His knowledge in that regard was exceptionally great. He had had some eight years' experience as fireman before receiving his injury, during which time he had known of several explosions of lubricator glasses, on one of which occasions he received a personal injury. The stock of shields to draw from in case of need was usually kept in the storeroom at the roundhouse, and the only way the engineer had of getting one was by a written requisition. The course of business in handling a locomotive was for the

engineer in charge to turn it over to the roundhouse foreman at the end of his trip with a report of its condition, and for such foreman to turn it over to the engineer next in order to take it out in proper condition for service.

On the occasion material to this case the locomotive was taken out with plaintiff as the fireman. There was no shield on the indicator glass and had not been for several days. He knew about 5 o'clock in the afternoon that he was going on the trip, and the locomotive to be used, being informed thereof by the roundhouse foreman. He had never before made a trip on that particular engine. He saw it at the time of receiving notice from the roundhouse foreman as aforesaid, and performed some duties in and around the same in respect to putting it in order for the trip, such as filling the lamps and looking after the supply of oil. About 7:15 p. m. he boarded the engine and found the engineer there. He filled the pump lubricator and did his duties in respect to making ready for the trip. About 8 o'clock, as the engine was backed out of the roundhouse, plaintiff observed that the front indicator shield, before mentioned, was not in place, and informed the engineer of that fact. Immediately thereafter the plaintiff looked in his seat box to find a shield, and failing in that he remarked to the engineer, "You must get a shield for this lubricator," to which the engineer replied, "All right, I will get one." By reason of some delay in the railway service the engine did not proceed on its trip till about two hours after the conversation related occurred, during which time plaintiff was in and out of the cab and performed his duties in keeping up the fire and keeping the engine ready to start as soon as orders were received to do so. The engineer, in the meantime, was out of the cab some, his whereabouts not being all of the time known to plaintiff. The engine during all of the time was located a considerable distance from the roundhouse, and the engineer had little opportunity to obtain a shield without

his movements in that regard being brought to plaintiff's attention. Plaintiff testified that after the conversation with the engineer he paid no further attention to whether the promise to obtain a shield was kept or whether there was a shield on the indicator glass. There was evidence to the effect that the engineer had no authority to hire or discharge his fireman. There was no evidence as to the duty being intrusted to the engineer to see that the shield was kept on the lubricator glass. Plaintiff had proceeded on his trip about fifty miles and arrived at Kewaskum station before the injury occurred. At such station, while waiting for a train to pass, about 1 o'clock a. m., plaintiff was standing beside his seat box eating his lunch, when the lubricator glass burst and flying pieces of glass struck him in the face causing him to involuntarily move backward and fall out of the cab to the ground, striking on his back, thereby receiving severe injuries.

Plaintiff admitted on the trial that he had previously testified under oath that he knew all the time the condition of the lubricator, and that such testimony was true. There was also evidence tending to establish or establishing what has been related, and there was other evidence upon which it was claimed by plaintiff's counsel that the failure to have the shield on the lubricator glass rendered plaintiff's position in the cab unreasonably dangerous; that he submitted to such danger relying on the promise of the engineer, made at the time the engine left the roundhouse, to supply a shield for the glass; and that up to the time of the accident he was ignorant of the engineer's failure to keep such promise.

At the close of the evidence counsel moved the court for the direction of a verdict, which motion was denied. The case was then, under instructions from the court, submitted to the jury for a special verdict, with substantially the following result:

(1) Plaintiff was injured by an explosion of the lubricator on defendant's engine, December 24, 1897.

(2) The glass was not protected by a shield at the time of the accident.

(3) The defendant was guilty of a want of ordinary care in omitting to have the shield in place.

(4) When plaintiff left the roundhouse he informed the engineer of the absence of the shield.

(5) Thereupon the engineer promised to procure a shield.

(6) Such promise was not performed.

(7) Plaintiff did not know when he started on his trip that no shield had been placed on the lubricator.

(9) He continued his work relying on the engineer's promise.

(10) His continuance, relying upon the engineer's promise, was not for a longer time than an ordinarily prudent person would expect the engineer would need to keep his promise in.

(11) The danger to be apprehended from the absence of the shield was not so obvious, great, immediate, and constant that a person of ordinary care, under the circumstances, would not have subjected himself to it.

(13) A person of ordinary care, possessing the knowledge of plaintiff of the danger to be apprehended from an unprotected lubricator glass, would have remained on the engine under the circumstances.

(14) Plaintiff's liver was displaced as a natural and direct result of the ·accident.

(15) Plaintiff is suffering from a spinal-cord injury as a direct result of the accident.

(16) The absence of a shield upon the lubricator glass was the proximate cause of plaintiff's injury.

(17) Plaintiff's damages are measured by $8,000.

Judgment was rendered in plaintiff's favor in accordance with the verdict, exceptions being saved to rulings on evidence and other rulings upon which the errors assigned on this appeal and discussed in the opinion are based.

*Edward M. Hyzer*, for the appellant.

For the respondent there was a brief by *Quarles, Spence & Quarles*, and oral argument by *W. C. Quarles* and *George Lines*. They contended, *inter alia*, that the plaintiff relied upon the promise of one who was charged by the master with the duty of providing this appliance. He was his immediate superior. The objection was made seasonably to the proper and only source, and the promise of the engineer was the promise of the company. This would be the law, even though a corresponding duty to furnish a shield rested also upon the roundhouse foreman. *Homestake M. Co. v. Fullerton*, 69 Fed. Rep. 923–928; *Dells L. Co. v. Erickson*, 80 Fed. Rep. 257; *Brabbits v. C. & N. W. R. Co.* 38 Wis. 298, 299; *Bessex v. C. & N. W. R. Co.* 45 Wis. 477; *Heine v. C. & N. W. R. Co.* 58 Wis. 530; *Belair v. C. & N. W. R. Co.* 43 Iowa, 662; *Railroad v. Kenley*, 92 Tenn. 215; *Gulf, C. & S. F. R. Co. v. Brentford*, 79 Tex. 619; *Cadden v. Am. S. B. Co.* 88 Wis. 419.

MARSHALL, J. It is rightly contended by appellant's counsel, and conceded by counsel for respondent, that unless as a matter of law, on the evidence, the engineer stood towards the respondent in the master's place, charged with its duty to furnish him a reasonably safe place in which to perform his work, as regards the guarding of the lubricator glass, and there was reasonable ground on the evidence for the finding that he submitted himself to the risk which resulted in his injury upon the faith of the engineer's promise to perform that duty, and was not guilty of any want of ordinary care in so doing, the judgment is wrong. The jury did not find whether the engineer and respondent were fellow-servants in respect to the matter stated. Perhaps no finding was necessary. Probably it should be said that the evidence bearing on the subject is undisputed and that the inferences that may reasonably be drawn therefrom are not conflict-

ing. Yet, just how the learned court reached the conclusion that the relation existed, requisite to charge defendant with the engineer's promise, does not clearly appear.

Generally speaking, all trainmen, from engineer to the humblest employee, are fellow-servants and only such. *Howland v. M., L. S. & W. R. Co.* 54 Wis. 226; *Heine v. C. & N. W. R. Co.* 58 Wis. 528; *Fowler v. C. & N. W. R. Co.* 61 Wis. 159; *Pease v. C. & N. W. R. Co.* 61 Wis. 163; *Southern Fla. R. Co. v. Price,* 32 Fla. 46; *Ohio & M. R. Co. v. Tindall,* 13 Ind. 366; *Clifford v. O. C. R. Co.* 141 Mass. 564; Elliott, R. R. § 1330. To take the situation in question out of that general rule requires evidence to the effect that the furnishing of the guard for the lubricator glass was not only the duty of the master — a duty distinct from those minor details of business which may be left to servants, as such, to attend to — but that the master intrusted such duty to the engineer. Where the evidence is to that effect, as before indicated, does not clearly appear. It may be that the idea of the trial judge was that since the engineer was superior in grade of service to his fireman, the relation of master and servant existed between them. But that is not the test, as is abundantly shown by the adjudications of this court above cited. Mere rank has nothing to do with the question. The test is the nature of the act in which the persons are engaged. *Cadden v. Am. S. B. Co.* 88 Wis. 409; *Dwyer v. Am. Exp. Co.* 82 Wis. 307; *McMahon v. Ida M. Co.* 95 Wis. 308. Under that rule a foreman, or other person superior in authority and responsible to another as master, and the men under him, so far as relates to the work in which they are jointly engaged, though in different capacities and though such foreman or other person has authority to hire and discharge such men, are fellow-servants. But we will not pursue this subject further or decide this branch of this case. Some attention has been given to it so the case will not be referred to hereafter as holding that in such a situation as the one in

Albrecht vs. Chicago & Northwestern R. Co.

question the promisor must be regarded as standing in the place of the master.

We may now proceed to the next and vital point in the case on the assumption, for the purposes of the decision, that it was actionable negligence for defendant to leave the lubricator glass unguarded; that the duty to attend to that matter was intrusted to the engineer; that as the engine left the engine house respondent objected to continuing in defendant's service unless it was attended to, and that the engineer then promised to do so.

Now it is claimed by counsel for appellant, and conceded by respondent's counsel, as is the law, that if an employee object to continuing in the service of his master because of some danger attending the same which it is the duty of the latter to remedy, he may, relying upon the master's promise to perform that duty, remain in such service for such reasonable length of time as may be required for that purpose, if the danger be not so obvious and immediate that from his standpoint it should be remedied at once; yet when such reasonable time shall have expired and the servant knows, or by the exercise of ordinary care ought to know, that the danger still exists, if he remains in the service and subjects himself to such danger he is chargeable with that form of contributory negligence known as assumption of the risk and is remediless for any injury that thereafter happens to him thereby.

When did the time expire within which the engineer should, in all reason, have redeemed his promise to place a guard upon the lubricator glass? The trial court seems to have determined from the undisputed evidence, as a matter of law, that it expired when the engine left the Milwaukee depot to go on the trip. That is clearly shown by the way the special verdict was framed. It contains findings favorable to respondent in regard to whether the engineer placed a shield upon the lubricator glass before the engine started

on the trip and whether respondent knew when such trip commenced that the glass was still unguarded, and the case was made to turn on such findings. However, strangely enough, the jury also found that plaintiff did not continue in defendant's employment longer than was reasonable for a person of ordinary care and prudence, under the circumstances, to expect that the engineer would procure the shield and place it upon the lubricator. That finding, with the others referred to, seems to convey very inconsistent ideas. Together they say a reasonable time to procure the shield and place it upon the lubricator expired when the engineer started out on his trip, yet respondent, as a person of ordinary care and prudence, may reasonably have expected the time for remedying the danger complained of had not fully expired when the injury happened, some three hours after the engine left Milwaukee.

That the promise should have been redeemed before the engine left Milwaukee, and that respondent so expected if he had any expectation that the lubricator glass would be guarded for the trip he was about to make, is too clear for reasonable controversy. There was no need for submitting that question to the jury, nor any other question bearing on the subject. The evidence was all one way that respondent had no personal interest in the condition of the lubricator except for the trip he was about to enter upon. He had never before been out with that engine, and of course did not know that he would be called upon to do so again. The place to procure the shield was at the roundhouse in the city of Milwaukee, which the engine was leaving when the promise was made, and to which it did not thereafter return. A few moments after the promise was made, and without any absences of the engineer to give respondent ground to believe that he had made a trip back to the roundhouse, the engine moved to the vicinity of the Milwaukee depot, a considerable distance away, and there it remained

nearly two hours before the start on the trip was made, during which time the engineer remained with it to the respondent's knowledge, and the latter was in the engine cab attending to his duty of keeping up steam, which duty required him to often look at the steam gauge located a little under the lubricator glass. If respondent expected the shield to be placed on the glass before going out on the trip, and we think the circumstances all indicate that he did not, when the opportunity for doing so no longer existed, obviously, the time for redeeming the promise had expired.

The verdict of the jury, to the effect that the time for removing the danger complained of had not expired when the accident occurred, is certainly without any evidence to support it. That finding is the only one directly on the subject of when the period covered by the promise expired, though, as before indicated, the way the verdict as a whole was framed shows that the trial court's view was, as the fact is, that such period can by no stretch of reason be extended into the time when the engineer no longer possessed the means of redeeming his promise before leaving the city of Milwaukee on the trip.

The conclusion from the foregoing is that, by going out on the trip under the circumstances, respondent assumed the risk of the condition of the lubricator, if he knew or ought to have known that the engineer had failed to keep his promise. The jury said he did not know that fact when the trip commenced, and that he proceeded relying on the promise. It is impossible, in our view, to find any reasonable ground in the evidence for those findings. They are contrary to all reasonable probabilities and contrary to the evidence of respondent. He regarded the absence of the shield as rendering his working place exceedingly dangerous. He knew that such absence was liable to result at any instant, and without any warning whatever to enable him to avoid it, in inflicting upon him a serious bodily injury. Every

reasonable probability supports the idea that his attention was naturally drawn, or should have been, to the condition of the lubricator, many times before he left Milwaukee. True, on principle he had a right to assume that the engineer's promise would be kept, but he could not continue to so assume when he had the evidence to the contrary right before him. If the defect had been located where it would not naturally have come under his observation, the presumption mentioned would excuse ignorance to a certain extent of the true situation; but it was not so located. The difficulty was in his immediate surroundings, at a point where he could not fail to observe it by reasonable attention to such surroundings. We may well say that it would have been very difficult if not well-nigh impossible for him to have worked in and about the engine cab two hours without observing the absence of the shield if he had tried to avoid seeing it. Much of the time he was where he could easily have reached the lubricator glass with his hand. It was many times within the range of his vision as he was about his work. It was not over two or three feet in front of him as he stood facing the boiler in the act of looking at the steam gauge or performing other duties, where he must necessarily have stood on many occasions, and it was only a little more than one foot above the level of his eyes. The idea that respondent worked within a few feet of the lubricator for two hours before leaving Milwaukee, yet did not observe that the glass remained unguarded, since the unguarded condition was deemed by him to be exceedingly dangerous, is so improbable that the wonder is how it could have found a place in the verdict or been approved by the trial court. The salutary limitation upon the power of a jury should not be forgotten, while, at the same time, such power should be firmly maintained to its full limit. As to what is the truth as established by evidence, within the realms of reasonable probability, in contemplation of law the judgment of a jury

is well-nigh infallible, and when approved by the trial judge is so. If they were permitted to go beyond that, the best system human wisdom has yet devised for discovering the truth would be sadly deficient indeed.

If respondent had testified that he looked at the lubricator and did not observe the absence of the shield, or, without having affirmatively testified that he so looked, had testified that he did not know of the absence of the shield at any time after the engineer's promise was made, the situation would not be changed. The finding of the jury would still be against all reasonable probabilities. But he did not so testify. His testimony is rather to the effect that he did know the true situation all the time up to the instant of the injury. He seems to have appreciated, in giving his testimony, the extreme improbability of a person circumstanced as he was being ignorant of those things which were almost before his eyes; so he contented himself in saying that he did not pay any attention to the condition of the lubricator. Counsel for defendant tried patiently, by a long and fair cross-examination, the record of which occupies many pages of the printed case, to obtain a direct answer from respondent as to whether he knew when the engine left Milwaukee that there was no shield upon the lubricator glass; and the trial judge participated to the same end, endeavoring by repeating the counsel's question and striking out nonresponsive answers and commanding the witness to answer responsively; still he persisted in saying that he did not pay any attention to the matter. After the many evasive answers referred to, the witness's attention was called to his examination under oath on a former occasion, and he then admitted that the following questions were there propounded to him and that he gave the following answers thereto: " Q. Do you swear that you did not see whether or not there was a shield on when your engine left the city of Milwaukee that night? A. After I spoke to the engineer about

the shield I paid no further attention to it. I knew that there was no shield on there. If there was I would have seen it. *Q.* You knew when you started out from Milwaukee that there was no shield on the lubricator, did you? *A.* Yes, I knew all the while there was no shield on the lubricator. If there had been one I would have seen the shield. *Q.* You still swear that you knew there was no shield on it when your engine started from Milwaukee? *A.* No; there was no shield on there. If there had been a shield on I would have known it. I paid no more attention to it." That was followed by questions as to whether the witness still adhered to his previous statements, as follows: " *Q.* Do you remember that testimony? *A.* Yes. *Q.* And that is true, is it? *A.* Yes." His answer, repeated many times, in terms or effect that he did not pay any attention to the lubricator after notifying the engineer of the absence of the shield, was entirely consistent with his knowing as a fact, when he left Milwaukee, that the shield was not in place. One cannot read his testimony as a whole and come to any other reasonable conclusion than that, from the physical situation, he must have been fully informed as to the absence of the shield, and that such testimony contains a full confession to that effect. The court should have so decided on the motion to direct a verdict for defendant, and failing in that should have so decided on the motions made on behalf of defendant after verdict, including the motion for judgment in its favor.

When the time expired for the engineer to redeem his promise, under the circumstances indicated, respondent was no longer protected thereby in his right to hold defendant responsible for the consequences of the danger, if it be conceded that the promise had that effect at all. In proceeding thereafter in defendant's service, he voluntarily assumed the risk of which he had complained, as a part of his contract of employment, and is remediless for what followed.

That is very unfortunate; but the law must not be turned aside from the definite lines upon which it has been established in order to fit the necessities of a party in a particular case. That cannot be done for the benefit of one person without committing a great wrong upon another. Neither can juries, as before indicated, be permitted to find one way to recompense an unfortunate person for his injury, when all reasonable probabilities are the other way. *Badger v. Janesville C. Mills*, 95 Wis. 599; *Roth v. S. E. Barrett Mfg. Co.* 96 Wis. 615; *Cawley v. La Crosse City R. Co.* 101 Wis. 145; *Lee v. C., St. P., M. & O. R. Co.* 101 Wis. 352; *Baxter v. C. & N. W. R. Co.* 104 Wis. 307, 330; *Wunderlich v. Palatine F. Ins. Co.* 104 Wis. 382. Courts must not overstep those wise limitations upon remedies for misfortunes, however serious they may be, to award compensation therefor. They fall within the maxim, *damnum absque injuria.*

*By the Court.*— The judgment of the superior court is reversed, and the cause remanded for a new trial.

BARDEEN, J., took no part.

As to the rights of a servant who continues work on the faith of the master's promise to remove a specific cause of danger, see note to *Illinois Steel Co. v. Mann* (170 Ill. 200), in 40 L. R. A. 781.— REP.

