[No. 7696. Decided January 5. 1909.]

C. F. MORGAN, *Respondent*, v. RAINIER BEACH LUMBER COMPANY, *Appellant*.[1]

MASTER AND SERVANT—ASSUMPTION OF RISKS—PROMISE TO REPAIR —CONDITIONAL PROMISE. The promise by the owner of a logging road, on the complaint of one employed as a locomotive engineer, to repair the railroad track at a dangerous curve as soon as its section boss returned, which would be in a "few days," relieves the servant of the assumption of risks, where, in less than a week, the want of repairs caused an accident before such return; there being no distinction between an unconditional promise to repair and one to repair after a definite date or event, where the accident happens before such date or event.

SAME—RIGHT TO RELY ON PROMISE—QUESTION FOR JURY. Whether a defect in a railroad track is so bad and apparent that no prudent servant would use the same in reliance upon a promise to repair, is for the jury, unless the evidence leaves room for no two opinions on the subject.

TRIAL—PROVINCE OF JURY. The determination of the preponderance of conflicting evidence is for the jury, and not the appellate court.

Appeal from a judgment of the superior court for King county, Albertson, J., entered March 9, 1908, upon the verdict of a jury rendered in favor of a locomotive engineer for personal injuries sustained in the derailment of his engine. Affirmed.

*R. S. Eskridge* and *Philip Tindall*, for appellant.

*Jackson Silbaugh*, for respondent.

[1]Reported in 98 Pac. 1120.

FULLERTON, J.—The respondent brought this action to recover for personal injuries received by him while in the employment of the appellant as a locomotive engineer. The appellant at the time of the injury was engaged in the business of logging and manufacturing lumber, and owned and operated as a part of its equipment a logging road, some two miles in length, having one terminal at Lake Washington, in King county, and the other in the timber towards the east. Midway between the terminals of the road was a switchback, formed by two switches some eight hundred feet apart. In going towards the Lake terminal, after passing the first switch, the road descended at a five or six per cent grade for about six hundred feet, when it made a sharp curve to the left and ascended a steep grade to the second switch. In order to ascend this last grade with a loaded train, it was necessary that the train have considerable momentum, and it was customary for the engineer to pass the curve at a speed of about twelve miles an hour. At the time the respondent was injured, he was bringing a train-load of logs from the timber to the lake. After leaving the first switch, the train passed down the grade in safety and at its usual speed; but when it reached the curve at the bottom of the grade, the rails spread under the engine, causing it to leave the track and turn over. In turning over, the engine caught the respondent, breaking his leg between the knee and the ankle, being the injury for which he sues.

It was shown, that the track was out of repair at the place of the accident; that the engine had left the track at that point once before when driven by another engineer; and that shortly before the accident a car had left 'the track at this, as well as another, point on the road because of the defective condition of the track. The respondent's evidence further tended to show, and the jury were warranted in finding, that when the car was being replaced at the latter place, which was less than a week before the accident, the respondent complained to the appellant's foreman of the

defective condition of the track generally, and the place where the accident occurred particularly, telling him that the track was in need of repair, especially at the latter place. In the same connection he also complained of the condition of the engine, saying that the brakes did not work properly. The foreman answered by saying that the section boss who had charge of the roadbed was away, but would return in a few days when the track would be gone over and put in first-class condition; that, as to the engine, the company had ordered a new one, which was then due to arrive, and as the old would be discarded on the arrival of the new one, the company did not feel justified in expending anything more in the repair of the old one. The appellant relied on these assurances and kept on with his work, when he met with the accident as above recited. At that time the section boss had not returned, nor had any attempt been made to repair the track. At the trial judgment went for the respondent for $2,500, and this appeal was taken therefrom.

But one contention is made for reversal, namely, that the evidence was insufficient to sustain the verdict and judgment. The appellant concedes the general rule that, when the master, or some one acting in his place and by his authority, promises to remedy a defect in the place in which, or the instrument with which, he requires his servant to work, on the complaint of the servant, the servant does not, by continuing in the employment, assume the risk of injury from the defect; but contends that there is no room under the facts shown in this case for the application of the doctrine. Counsel argue that the promise was not to repair immediately or within a reasonable time from the making of the promise, but was to repair within a reasonable time after the return of the section boss, which confessedly was not to occur until after a "few days" from the time the promise was made, and actually did not occur before the happening of the accident, and consequently the agreement to repair evidenced by the promise never became operative.

The authorities are not agreed as to the principle on which the liability of the master rests in this class of cases, yet all of the modern cases agree that where a servant makes · a complaint to his master of a dangerous defect in his place of work, or in the appliances furnished him with which to work, and the master makes an unconditional promise to repair the defect, the risk of the defect is cast upon the master until such time as would preclude all reasonable expectation that the promise might be kept, unless the danger from the defect is so imminent that no person of ordinary prudence would risk injury from it. *Crooker v. Pacific Lounge &·. Mattress Co.*, 29 Wash. 30, 69 Pac. 359; *Shea v. Seattle Lumber Co.*, 47 Wash. 70, 91 Pac. 623; *Hough v. Railway Co.*, 100 U. S. 213, 25 L. Ed. 612; 26 Cyc. 1209, and cases there collected.

But on whatever ground the liability may be assumed to rest, there can be no distinction in principle, in so far as the liability of the master is concerned, between an unconditional promise to repair, and a promise to repair on or after a certain date or after the happening of a particular event. The failure to repair after being so requested by the servant puts the master in the wrong. To fail to furnish his servant with a reasonably safe place in which, or a reasonably safe appliance with which, to work is a violation of a duty imposed on the master by law. The delay in making the repairs is for his benefit, not that of the servant, and the time within which it will be made is wholly within his control. If, therefore, he chooses for his own convenience to induce his servant to work in a defective place or work with a defective instrument, his liability must be the same whether he fixes a definite time when he will remove the danger or whether he leaves that time indefinite.

The cases cited by the appellant to maintain the contrary doctrine are *Standard Oil Co. v. Helmick*, 148 Ind. 457, 47 N. E. 14; *Albrecht v. Chicago & Northwestern R. Co.*, 108 Wis. 530, 84 N. W. 882, 53 L. R. A. 653; and *Rice v.*

*Eureka Paper Co.*, 70 App. Div. 336, 75 N. Y. Supp. 49. The first and last of these cases do maintain the principle contended for, but the first was overruled by the Supreme Court of Indiana in the subsequent case of *McFarlan Carriage Co. v. Potter*, 153 Ind. 107, 53 N. E. 465, the court using this language:

"The case of *Standard Oil Co. v. Helmick*, 148 Ind. 457, is urged upon our consideration as holding a contrary view. It should be noted that the question in that case related to the use of an ordinary crank, applied in the usual way to a square shank on the end of a shaft which revolved a machine in the occasional discharge of candles. The defect complained of was the worn condition of the shank, which had been brought about gradually by friction in the use of the crank. The plaintiff put on the crank, and, while engaged in turning the machine, the crank slipped off, and precipitated him against a platform, whereby he was injured. The court assigned the *Helmick* case to that class to which *Meador v. Lake Shore etc. R. Co.*, 138 Ind. 290; *Jenney etc. Co. v. Murphy*, 115 Ind. 566, and *Marsh v. Chickering*, 101 N. Y. 396, 5 N. E. 56, belong, which hold that in the use of simple implements and devices a promise to repair is not available as a defense. What was there said, contrary to the view herein expressed, was unnecessary to a decision of the case, and cannot be accepted as authority in the case at bar. Some expressions in *Burns v. Windfall Mfg. Co.*, 146 Ind. 261, and probably other of our cases may appear in conflict, but we are satisfied that the better reasons and a decided weight of authority support the law as above stated."

The case from the supreme court of New York was reversed by the court of appeals in 174 N. Y. 385, 66 N. E. 979, 62 L. R. A. 611; that court holding that the promise which the supreme court held to be a promise to repair at a fixed time was in fact a promise to repair generally without limitation as to time. The Wisconsin case, while not directly parallel as to its facts, may be said to support the appellant.

But the Wisconsin case, if it does not stand alone, is against the great weight of authority. The general rule is that the master, when he promises to repair a defect at a definite and agreed time, takes upon himself the risk from the time of the making of the promise up to and including the expiration of the time specified for its fulfillment. In *McFarlan Carriage Co. v. Potter, supra,* the servant was injured by a defective saw and saw table, which the master had promised to repair "as soon as the job of work that said company was then working on was completed." The servant was injured before the job was completed, and it was argued there, as here, that the time for the execution of the promise had not then arrived. The court held the master liable, using this language in its opinion:

"A promise to repair is confession to a breach of duty, and when a master, to right himself, requests and induces a postponement, either for convenience or profit, no principle of justice will lay the burden of delay upon the unoffending servant. The whole question is bottomed upon the wrong of the master, and it is sophistry to argue that the servant, by confiding in the master's promise, for a reasonable time in which to cure the defects, clearly obvious though they be, should be chargeable with having waived the master's duty to him, and assumed the additional risk himself..   .   .   .
It is also insisted that the complaint is bad because it shows that the plaintiff's injury was received before the job was completed, and before the time for execution of the promise had arrived, the insistence being that the promise to repair, as made, did not begin to operate until the job was completed, and that the shielding period was the reasonable time the plaintiff might rely upon the performance of the promise after the completion of the job. We cannot approve this view. We perceive no sound reason, and none has been suggested, for holding that such a promise has no force till the time arrives for its execution, and that it does not become effective until after it is broken. It is clear, and the view has the support of an overwhelming weight of authority, that a promise to repair is at its best the moment it is made and acted upon."

In *Greene v. Minneapolis & St. Louis R. Co.*, 31 Minn. 248, 17 N. W. 378, 47 Am. Rep. 785, the servant, a locomotive engineer, had complained to the master of a defect in the engine which he was required to operate, and was promised that it would be repaired at the end of the next trip. Before the end of the trip the servant was injured while operating the defective engine, and by reason of the defect. It was held that the servant could recover. Discussing the effect of the promise, the court said:

"If a servant, before he enters a service, knows, or afterwards discovers, that the instrumentalities furnished for his use are defective, and understands, or by exercise of ordinary observation ought to understand, the risks to which he is thereby exposed, and if, notwithstanding such knowledge, he, without objection, and without any promise on the part of the employer that such defects will be remedied, enters or continues in such service, he cannot recover for injuries resulting therefrom, but will be deemed to have assumed all the risks of the employment thus known.

"But it is now almost equally well settled that if a servant who has knowledge of defects in the instrumentalities furnished for his use, gives notice thereof to his employer, who thereupon promises that they shall be remedied, the servant may recover for an injury caused thereby, at least where the master requested him to continue in the service, and the injury occurred within the time at which the defects were promised to be remedied, and where the instrumentality, although defective, was not so imminently and immediately dangerous that a man of ordinary prudence would have refused longer to use it. . . .

"Courts also differ as to the ground upon which this should be placed. Some place it upon grounds of policy and justice—upon a consideration of the unequal situation of master and servant; others, upon the ground that, in such cases, the facts rebut the presumption of a waiver on the part of the servant; others, upon the ground of a contract on the part of the employer, implied from the facts, that if the servant continues in the service in the meantime, and until the defects are remedied, the employer and not the servant will assume the risks. We will not attempt to determine

which of these is the best or most logical reason for the rule, except to say that the last seems to us very forcible, especially where there is a request to the servant to continue in the service. It is sufficient for us that the rule has generally commended itself to the judicial mind (as it does to us) as founded in sound policy and common justice. If the emergencies of a master's business require him temporarily to use defective machinery, we fail to see what right he has in law or natural justice to insist that it shall be done at the risk of the servant and not his own, when, notwithstanding the servant's objection to the condition of the machinery, he has requested or induced him to continue its use, under a promise thereafter to repair it."

In the case of *Roux v. Blodgett & Davis Lumber Co.*, 85 Mich. 519, 48 N. W. 1092, 24 Am. St. 102, the servant was employed in the master's sawmill. He was working close to bevelled gear wheels, which up to the day preceding the accident had been covered. On the day preceding the accident the covering became broken, and at night the servant called the master's attention to the fact. When the servant reached the mill on the morning of the accident he saw that the defect had not been remedied, and again called the master's attention to it. The master promised to repair it at the noon hour, telling the servant to take care of himself until that hour. Before the noon hour, the servant's clothing caught in the exposed gearing, and his leg was drawn therein and crushed. On appeal from a judgment in his favor, the court said:

"It is urged that plaintiff's knowledge of the exposed and dangerous condition of this gearing was equal to that of his employers, and by continuing his work he assumed the risk. This rule of law is not applicable to the circumstances of the present case. The risk to which plaintiff was exposed on the day of the injury was not ordinarily incident to his employment. The danger was not one existing at the time of his engagement. It was a temporary peril. It did not arise until the day before the injury. In view of the danger this very machinery had been covered up. Plaintiff, acting as a prudent man should, had, on the evening before, and

again on the very morning of the accident, notified defendant of the fact that the gearing was exposed, and defendant had, in recognition of the danger, and of plaintiff's exposure thereto, promised to replace the covering, and instructed the plaintiff to continue his work until noon, when it should be done. There was no voluntary assumption of the risk on the part of the plaintiff. He proceeded under protest. It was defendant's bounden duty, when notified, to re-cover this gearing. It was postponed to suit defendant's convenience, and not that of the plaintiff."

Other cases to the same effect are the following: *Anderson v. Seropian*, 147 Cal. 201, 81 Pac. 521; *Louisville Hotel Co. v. Kaltenbrun*, 26 Ky. Law 208, 80 S. W. 1163; *King-Ryder Lumber Co. v. Cochran*, 71 Ark. 55, 70 S. W. 606; *Cudahy Packing Co. v. Skoumal*, 125 Fed. 470.

In *Andrecsik v. New Jersey Tube Co.*, 73 N. J. L. 664, 63 Atl. 719, 4 L. R. A. (N. S.) 1913, it appeared that a servant in charge of a machine in his master's mill discovered a. defect in the machine some time prior to ten o'clock in the morning, and at that hour complained to the superintendent concerning it. The superintendent, in answer to the complaint, said to him: "You go right ahead with the work; we are overloaded with work, and at the noon hour I will fix this for you." The servant worked until the noon hour without injury. The defect was not remedied at the noon hour, and the servant went to work with the machine without further complaint, knowing that the defect had not been repaired, and was injured at three o'clock that afternoon. The court held he could not recover; that the effect of the promise was to cast upon the master the liability from the time of the promise to the time he agreed to make the repairs, but not having made them at the time agreed upon to the knowledge of the servant, the risk of injury thereafter was assumed by the servant.

The same doctrine was announced by the supreme judicial court of Maine in the case of *Dempsey v. Sawyer*, 95 Me. 295, 49 Atl. 1035. In the case at bar the respondent was

injured prior to the return of the section boss, and prior to the time it was indicated by the master that he would return. These cases therefore support the rule contended for by the respondent, since the time in which the repairs were to be made had not yet arrived. Whether the rule announced by them to the effect that the liability for the defect terminates at the expiration of the time fixed, if the repairs are not then made, is or is not sound, we need not here determine, but it is probable that this rule, like many others pertaining to this class of cases, must be governed largely by the circumstances. Since defects such as was complained of in the case at bar could not have been repaired at an instant, or perhaps without several days' labor, it would be much more rational to hold that the liability continued until such reasonable time after the section boss' return as it would take to make the repairs. But be this as it may, we are clear that the appellant, by promising to repair the defects in the track on the return of the section boss, took upon itself the liability for any injury to the respondent arising from the defect between the time of making the promise and the time fixed for the section boss' return; and as the injury to the respondent happened between those dates, it was liable to respond in damages for that injury.

It is next said that the appellant is excused from liability for the reason that the track was so notoriously bad, and the danger of the accident from derailment so apparent and obvious, that no person of ordinary intelligence and prudence would have incurred the risk. But we do not think the evidence upon this question was so definite as to leave no room for two opinions, and unless it was thus definite, the question was for the jury. The court rightly submitted it to them.

Whether the respondent operated the train in a dangerous manner and contrary to the orders of the appellant, and whether this manner of operating the train contributed to his injury, were likewise questions of fact for the jury. The evidence being in conflict upon these questions, the right to

determine its preponderance was with the jury; the right does not rest with the appellate court.

The judgment is affirmed.

MOUNT, CROW, and RUDKIN, JJ., concur.

HADLEY, C. J., DUNBAR, and CHADWICK, JJ., took no part.