## JOHNSON v. UTAH CONSOLIDATED MINING COMPANY.

No. 2297.   Decided June 7, 1912 (125 Pac. 407).

MASTER AND SERVANT—INJURIES TO SERVANT—PROMISE TO REPAIR—
MASTER'S LIABILITY—ASSUMED RISK. Where a master has made
a promise to repair a defect, the master and not the servant
assumes the risk of injury caused thereby within such time
after the promise as would be reasonably allowed for perform-
ance and within a period which would not preclude all reason-
able expectation that the promise might be kept.

APPEAL from District Court, Third District; *Hon. M. L. Ritchie,* Judge.

Action by Nels Johnson against the Utah Consolidated Mining Company.

Judgment for defendant.    Plaintiff appeals.

REVERSED AND REMANDED WITH DIRECTIONS.

*Weber* and *Olson* for appellant.

*King* and *Nibley* for respondent.

STATEMENT OF FACTS.

Plaintiff brought this action to recover damages for personal injuries alleged to have been sustained by him on May 28, 1909, while employed as a miner in defendant's mine in Bingham Canyon, Utah.

The complaint, in substance, alleges that defendant, a corporation, owns and operates the Highland Boy Mine in Bingham Canyon, Utah; that on the day of the injury plaintiff was employed in the capacity of a miner and machineman in a certain stope on the eight and a half level of the mine; that defendant carelessly failed and neglected to furnish plaintiff a reasonably safe place in which to perform the work required of him under his contract of employment; that plaintiff, after he began work, apprehended that the earth and rock over the point where he was at work was unsound and required timbering in order to make the place reasonably safe, notified defendant's shift boss of the condition, and told him that the place needed timbering; that the shift boss then promised plaintiff that a timberman would be sent down into the stope, and that the place would be timbered; that the plaintiff, relying on the promise thus made by the shift boss, continued with his work; that defendant carelessly and negligently failed to have the place timbered; and that by reason of defendant's negligence in that respect the earth and rock under which plaintiff was at work fell upon and severely injured him.

· Defendant answered admitting that it owned and operated the mine and that plaintiff was employed therein, but denied the allegations of negligence contained in the complaint, and also denied the allegations therein that defendant promised to timber the place where plaintiff was at work. Defendant affirmatively pleaded contributory negligence and assumption of risk on the part of plaintiff, and that his injuries, if any, resulted from carelessness of his fellow servants.

A trial was had to a jury which resulted in a verdict for defendant. From the judgment rendered on the verdict, plaintiff appeals.

The facts as disclosed by the record are about as follows: Plaintiff, at the time the accident complained of occurred, was operating a drilling machine. He had been a miner for about nine and one-half years, and had worked in this particular mine for about eight years before the accident. On the evening in question plaintiff went to work on the eight and a half level of the mine at about six o'clock. It is admitted on the part of the defendant that the stope in which plaintiff was working was twelve feet wide and twenty-one feet in length. The evidence introduced by plaintiff tended to show that the stope was from thirty to forty feet in length. The apparent discrepancy in the evidence on this point is, as we view the case, of no importance. Extending throughout the length of the stope was a car track eighteen inches wide, over which ran the cars used in carrying out the ore and waste. Under this track, and at right angles with it, in the center of the stope, were laid two sills. These sills had previously supported timbers which had been blown out by blasting. From the end of the sills to the left wall was about four feet. When plaintiff first went to work in the stope on the evening in question, he went over the roof or top of the stope with a pick and bar and picked down all the loose material he could find there. He testified that the top of the stope sounded "drummy," and that he "tried to pry it down," but was unable to do so; that he "thought it might fall if it was not timbered." After sounding the roof of the stope and picking down what loose material he could find there, he set

up the drilling machine, which was operated by compressed air, on the left hand side of the stope directly opposite the sills and began drilling into the left wall of the stope, which was in solid ore. The record, as it now stands, shows that, from the time plaintiff went to work at six o'clock on the evening in question until the breaking loose of the material that injured him, the stope was not enlarged nor was the appearance otherwise changed.

Regarding the dangerous condition of the roof of the stope prior to the accident on the evening in question, Gus Oman, a machine and timberman who was working on the ninth level of the mine at the time of the accident, was called as a witness for plaintiff and testified in part as follows:

"I know where Johnson worked that night. I was in there between eight and nine o'clock and saw Johnson there. . . . I saw the top of the stope where Johnson was working. . . . She looked bad. She looked to me like she needed to be timbered up there. . . . It was not such a place as could be picked down by a machineman with his bar. . . . I thought it needed timbering. The place was big enough and the ground was liable to slough down any time. It was so wide and long and kind of bad ground so it needed timbering in there."

Another witness for plaintiff testified that he was working in the stope on the evening upon which the accident occurred. He added:

"I saw Johnson sound the roof with his pick. . . . He sounded the roof two or three times that night. . . . I was not in the stope when Johnson got hurt. I took a car out to the station. I came back in after he got hurt. . . . When I came in and saw Johnson lying on the track, I saw rock on the left-hand side of the track on the sill. I saw where it came from. It came from above, from above the top of the sill, above the sill. . . . It was inside the sill, about two feet from the sill, and some of it was near the machine."

At about eight o'clock that same evening defendant's shift boss came into the stope where plaintiff was at work and

41 Utah 10

spoke to him. There is a sharp conflict in the evidence re-
garding what was said by these parties on that occasion.
Plaintiff testified that the shift boss said, addressing plaintiff,
"How is she going?" That he (plaintiff) said: "It ain't
so bad, but this place don't look very good. We ought to
have it timbered up. The sills are down but no timbers
here." That the shift boss said he "would send timbermen in
there. The witness further testified on this point as follows:
"I told the shift boss that the place didn't look good; that it
was too big a place and no timbering. I told him to have
some timbers in there. It didn't sound right to me, and that
is the reason I asked for the timbers. . . . The shift
boss said that he would send the timbermen down. . . .
The shift boss offered to send timbermen in there and fix the
place. That is the reason I worked there."

Plaintiff further testified that he again examined the roof
of the stope between nine and ten o'clock and that he
"couldn't get nothing down;" that he continued drilling
with the machine until about eleven forty o'clock, when a
large "slab" of rock directly over the sills broke loose and fell
on him breaking his arm in two places and otherwise injuring
him.

The shift boss was called as a witness by the defendant
and testified that he came into the stope about eight o'clock
on the evening of the accident and spoke to the plaintiff, and
that he called there again at about eleven thirty, but denied
that there was anything said the first time he called either
by himself or the plaintiff about timbering the place where
plaintiff was at work. On cross-examination he testified that,
when he was in the stope at eleven thirty, he talked with the
plaintiff and that "there was something said about timber-
ing." He further testified as follows: "I said (addressing
the plaintiff), 'How is she going Johnnie?' He says, 'Pretty
good. Everything is all right.' 'Now,' I says, 'when we get
this (referring to ore and waste material) cleared up we will
start to timber this place again following the machine.' We
had previously timbered it. That is the practice in minng
to follow the machine as near as practicable and put square

sets in. That is for the purpose of holding up the roof wherever it may be loose or likely to fall, or wherever there may be slips which may come down. . . . There were two sills there. It had been timbered before, and it (the timbers) stood on these sills. . . . I told Johnson at eleven thirty that as soon as the muck was out we would start to timber, following the machine. There was lots of room where they wanted the timbers in of course. . . . The reason I told Johnson (plaintiff) we would timber it was because I thought he was concerned in it." This witness further testified that the accident occurred immediately after he left the plaintiff on the occasion last referred to, and when he was about thirty feet away; that he immediately returned to the machine and found that a large boulder of ore had fallen from the wall of the stope and about two feet from where the machine was standing; that it had broken loose from a point in the wall near the roof of the stope; that plaintiff was "lying down behind the column or bar of the machine close to the sill." He also testified that, if there had been timbers on the sills mentioned, they would not have been under the ore, and hence could not have prevented it from falling.

McCARTY, J. (after stating the facts as above).

The important and contested questions of fact that were submitted to the jury were: (1) Did appellant on the evening of the accident notify respondent's shift boss of the extra risks to which he claimed he was exposed because of the dangerous condition of the roof or top of the stope at the point where he was at work when injured, and did the shift boss, in pursuance of such notice, promise appellant that he would have timbers installed in the stope on the sills referred to in the foregoing statement of facts? (2) Did the ore and material that caused the injury complained of break loose and fall from a point in the roof of the stope over the sills mentioned, or did it come from a point in the roof where timbers resting on the sills would not have prevented it from falling on appellant?

The court, among other things, charged the jury:

"To constitute a promise to remedy dangerous conditions, no formal words of promise are necessary. Any acts or expressions by which the employer or his vice principal gives the employee to understand that the cause of the danger, if any, will be removed, constitute a sufficient promise, and, if the shift boss, Bray, made any statements to the plaintiff upon whch the plaintiff had reasonable grounds to rely that the stope would be timbered, the plaintiff did not assume the risk of any danger due to lack of timbering, unless the danger was so immediate, manifest, and imminent that no man of ordinary prudence would have remained there, notwithstanding the promise."

This instruction, so far as it goes, contains a correct statement of the law applicable to the facts in this case. Appellant requested the court to charge the jury that, "where the master promises that a dangerous condition will be remedied, the servant does not assume the risk of an injury caused by such dangerous condition within such period of time after the promise as would be reasonably allowed for the performance, unless the place is so manifestly and immediately dangerous that a man of ordinary prudence would have refused to work there, notwithstanding the promise. The effect of a promise by the master to remedy a dangerous condition is to relieve the servant from the assumption of the risk of the particular danger to which the promise relates, although the servant be fully aware of the same; it fastens the responsibility for any injury resulting from such dangerous condition upon the master, for a reasonable length of time during which the servant continues work in expectation that the promise will be fulfilled." The court refused to give this instruction, but instructed the jury that a promise made by Bray, resepondent's shift boss, "if any is proven by the evidence to have the stope timbered, would be the promise of the defendant company." And in instruction No. 12 the court said:

"The effect of such promise by the master is to relieve the servant from the assumption of the risk of the particular danger to which the promise relates, if the servant in good

faith relies on the promise, although the servant be aware of the danger, and, after allowing to the master a reasonable time to remedy the danger, makes the master responsible for the injury resulting from such dangerous condition *during such further reasonable time* that the servant continued to work in expectation that the master will remedy the defect." (Italics ours.)   The giving of this instruction and the refusal of the court to charge the jury as requested by appellant is assigned as error.

The rule as declared by practically all of the authorities is that, when the master in response to a complaint made by a servant of the unsafe and dangerous condition of the place in which the servant is at work promises to eliminate the particular danger complained of by putting the premises in a reasonably safe condition, and the servant, relying on the promise, continues at work for a reasonable time thereafter, the master, and not the servant, assumes the risks of the danger complained of during such reasonable time, unless the place is so obviously dangerous that a reasonably prudent man would decline to work there, notwithstanding the promise of the master.   And the weight of authority seems to be that it is not necessary that the servant, at the time of complaining of the extra hazards and dangers to which he is exposed because of the dangerous condition of the place in which he is at work, should threaten to abandon the work, nor that he should say in so many words that he apprehends danger to himself.   The authorities seem to hold that it is sufficient if it appears that the servant is induced to remain at work by reason of the promise to eliminate the danger, and that he had no intention of waiving his objection to the dangerous condition of which he complained.   20 A. & E. Ency. L. (2d Ed.) 127.

In 1 Shearman & Redfield on Negligence, section 215, it is said:

"There is no longer any doubt that, where a master has expressly promised to repair a defect, the servant does not assume the risk of an injury caused thereby within such a period of time after the promise as would be reasonably allowed for its performance, or indeed within any period which would not preclude all reasonable expectation that the promise might be kept."

And further along in the same section it is said:

"Nor, indeed, is any express promise or assurance from the master necessary. It is sufficient if the servant may reasonably infer that the matter will be attended to."

In 26 Cyc. 1209, the rule is tersely and, as we think, correctly stated as follows:

"Where the master or some one acting in his place promises to remedy the defect complained of, the servant, by continuing in his employment for a reasonable time after such promise, does not assume the risk of injury from the defect unless the danger was so patent that no person of ordinary prudence would have continued to work."

And on page 1211 of the same volume it is said:

"To be sufficient, a promise by the master to remedy defects or remove danger must be definite and certain, and must be made with a view to the servant's safety, and as an inducement to him to continue work. The promise may, however, be implied as well as express, general as well as individual."

In 2 Cooley on Torts (3d Ed.), p. 1157, the author says:

"If the master promised to repair the defect or remove the danger, he thereby assumes the risk arising therefrom, and the servant may continue for a reasonable time at the master's risk. . . .    After a reasonable time has elapsed, or, if a definite time is fixed, then after that has expired, the risk is again upon the servant.   Though the risk is on the master, the servant must exercise a reasonable degree of care in view of the danger to which he is exposed.   If the danger is obvious and such that a reasonably prudent man would not incur it, the rule does not apply and the servant continues at his own risk."

To the same effect are the following decisions: *Rothenberger v. N. W. Con. Milling Co.,* 57 Minn. 461, 59 N. W. 531; *Illinois Steel Co. v. Mann,* 100 Ill. App. 367; *A., T. & S. F. R. Co. v. Sadler,* 38 Kan. 130, 16 Pac. 46, 5 Am. St. Rep. 729; *Yerkes v. Northern Pacific Ry. Co.,* 112 Wis. 184, 88 N. W. 33, 88 Am. St. Rep. 961; *Picart v. Chicago, etc., Ry. Co.,* 82 Iowa, 148, 47 N. W. 1017; *Alton Lime & Cement Co. v. Calvey,* 47 Ill. App. 343; *Hough v. Railway*

*Co.,* 100 U. S. 213, 25 L. Ed. 612; *T. & N. O. Ry. Co. v. Bingle,* 9 Tex. Civ. App. 322, 29 S. W. 674; *Andrecsik v. New Jersey Tube Co.,* 73 N. J. Law, 664, 63 Atl. 719, 4 L. R. A. (N. S.) 913, 9 Ann. Cas. 1006; *Foster v. Chicago, etc., R. Co.,* 127 Iowa, 84, 102 N. W. 422, 4 Ann. Cas. 150; *Morgan v. Rainier Beach Lum. Co.,* 51 Wash. 335, 98 Pac. 1120, 22 L. R. A. (N. S.) 472, and note.

The case of *Foster v. Chicago, etc., R. Co., supra,* is also published in 127 Iowa, 84, 102 N. W. 422, 4 Ann. Cas. 150, and we invite attention to an elaborate and instructive note appended to the decision in said last-named volume in which the annotater cites numerous cases in which this question was involved. From the decisions there cited, the annotater concludes that "the reasoning supporting this rule is that, when the master has knowledge of the defect and promises to repair the same, he impliedly requests the servant to continue at work, and impliedly assumes responsibility for any accident that may result from the defect during the reasonable time within which repairs should be made."

In this case, as we have pointed out, the evidence introduced in behalf of appellant tended to show that the top or roof of the stope directly over the sills was "drummy" and appeared to be in an unsafe condition, and that it might break loose and fall at any moment; that appellant notified respondent's shift boss of the dangerous condition of the stope at that point, and stated to him that it needed timbering; that the shift boss promised to have the place timbered; that the material which fell and caused the injury complained of came from a point in the roof of the stope directly over the sills, and that, if timbers had been installed in the stope on the sills as promised, the accident would not have occurred. Under the authorities cited, we are clearly of the opinion that appellant's request, when considered in connection with other portions of the court's charge, contains a correct statement of the law applicable to the issues of fact in this case and should have been given.

Counsel for respondent vigorously contend that the court did, in effect, charge the jury as requested by appellant. We

do not think so. The court, by giving that part of the instruction on this question wherein it is said that, "after allowing to the master a reasonable time to remedy the danger, makes the master responsible for injury resulting from such dangerous condition *during such further reasonable time* that the servant continues to work," etc., in effect charged the jury that the respondent was entitled to a reasonable time in which to timber the stope after the alleged promise was made before it could be held to have assumed the risk of the particular danger of which complaint was made. In other words, the jury were told that appellant continued to assume such risk for a reasonable time after the promise, and then respondent assumed the risk "during such further reasonable time" that appellant continued to work in expectation that respondent would remedy the dangerous condition of the stope. Whatever doubt or uncertainty, if any, there might be regarding the legal effect of the language used when read and considered alone, separate and apart from the balance of the charge, is removed and the instruction is made plain and certain by reading in connection therewith instruction No. 23, which is as follows:

"If the alleged conversation testified to by plaintiff occurred at about eleven thirty o'clock in the evening, then your verdict must be for the defendant. In other words, if you should believe that the conversation took place between plaintiff and the witness Bray referred to by plaintiff, but that it took place just a few minutes before the accident to plaintiff, then your verdict must be for the defendant."

This instruction, the giving of which is assigned as error, we think clearly demonstrates that the court, by giving instruction No. 12, *supra,* intended to do just what the phraseology therein used purports, namely, tell the jury that appellant continued to assume the risk of the particular danger complained of for a reasonable time after the alleged promise was made.

From what we have said it necessarily follows that the giving of instruction No. 23 was in and of itself prejudicial error. Under the facts of this case, the promise of Bray (the

shift boss), if made a few moments only before the accident, had the same effect upon the contractual relations existing between appellant and respondent as it would have had if made several hours prior thereto. As we have hereinbefore stated, the rule, as declared by practically all of the authorities, is that a promise by the master to remedy a dangerous condition known to the servant is an implied assumption of the risk by the master from the time the promise is made and for a reasonable time thereafter during which the servant continues to work in expectation that the promise will be fulfilled.

The judgment is reversed and the cause remanded to the district court, with directions to grant a new tral. Appellant to recover costs.

STRAUP, J., concurs.

FRICK, C. J (concurring).

I concur. I am not prepared to say, however, that the court was required to charge the jury in the exact language or form requested. The request may have been too broad in stating that the promise by the master "fastens the responsibility for any injury resulting from such dangerous condition upon the master," etc. This is not necessarily the result under all circumstances. The effect of such a promise merely shifts the risk of injury from the servant to the master, and prevents the master from successfully interposing the defense that the servant has assumed the risk. Whether the master is ultimately liable for an injury if the servant continues to perform the particular service in reliance upon the master's promise may, in a particular case, still depend upon whether the master was in fact negligent, whether the servant was free from contributory negligence, and whether the injury, if any was suffered, was the proximate cause of the master's or of the servant's negligence. The law with respect to when the risk shifts from the servant to the master was, however, correctly outlined in the request, and in my judgment the court erred in not charging the jury in that regard in substance as requested.

Nor can I agree with respondent's counsel that the charge as given by the court is a mere statement of the same principle of law in another form and is therefore, in legal effect, the same as what is contained in the request offered by appellant. Nor do I think that the court thought so, or it would not have used the phraseology used in the charge given. In view of the circumstances and of what the court said, there was no reason why the court should have adopted a different phraseology unless it desired to convey a different meaning to the jury. I am forced to the conclusion that the court intended to do just what the language used by it indicates, namely, to depart from the spirit of the charge as requested by appellant's counsel. If it did not succeed in doing so, as respondent's counsel now contend, this is because the language used does not have that effect. Even if this conclusion be sound, the result reached by my associates is still correct, because the charge as given by the court certainly left its meaning in grave doubt when it should have been clear and specific.