[No. 320.   Decided January 26, 1892.]

## J. L. WEEK, *Respondent*, v. FREMONT MILL COMPANY, *Appellant.*

MASTER AND SERVANT—DEFECTIVE MACHINERY—CONTRIBUTORY NEGLI-
GENCE.

A servant employed about dangerous machinery assumes the risks of such employment, and where he is injured in consequence of a defect in the machinery about which he is employed, and which is placed under his care, and from the nature of his employment and his duties in connection therewith he is better acquainted with the condition of such machinery and the danger of the service than his employer or any of his fellow servants, he cannot recover in an action against his employer for such injuries.

*Appeal from Superior Court, King County.*

Action by J. L. Week against the Fremont Mill Co. to recover damages for the loss of an arm in consequence of the defective machinery used in holding a saw in position in defendant's mill. Verdict and judgment for plaintiff for $8,000, from which defendant appeals.

*Wiley, Hale & Scott,* for appellant.

*James Hamilton Lewis,* and *L. Hulsether,* for respondent.

The opinion of the court was delivered by

Scott, J.—This action was brought by respondent to recover for personal injuries received by him while in the employ of appellant as a trimmer at appellant's mill in Fremont, King county, Washington.

The position of respondent was by a saw, called the trim saw, which was situated somewhere about midway between the head saw and the edger. The lumber, after leaving the head saw, was shoved along rollers to the trim saw, where, after being trimmed and cut into certain sizes, it was shoved past it and along rollers towards the edger, or out of the mill, as the case might be. It was respondent's duty, either by taking hold of the lumber with his hands, or by hooking an instrument therein, called the "picaroon," to help pull it up to the trim saw and adjust it there in the position in which it was to be cut, and then it was his duty to take hold of the handle attached to the saw, and by pulling the saw towards him, run it through the lumber. The frame of this trim saw was suspended from a point directly above the rollers. When the saw had been run through the lumber in this manner, it was drawn back by weights attached to a lever beneath the floor. A wire rope ran back from the saw through a sheave in the wall, and from there below the floor, where it was connected with this lever, upon which

weights were adjusted sufficient to draw the saw out of the way, and hold it there until it was to be used again by pulling it forward. When the saw was drawn back it was respondent's duty to assist in moving the lumber past the position of the saw along the rollers toward the edger, or out of the mill. In moving the lumber from the right side and past the saw towards the left side, or the side where the edger was, it was necessary for him to pass in front of it. While in the act of returning from the left side to the right side, after having assisted in shoving some of this lumber to the edger, the saw, by the breaking of the wire rope, swung forward against his right arm, inflicting the injuries complained of. He alleges in his complaint that defendant used "an old, worn, unsafe and insecure steel wire for the purpose of pulling the saw back into its position," etc., and that "said steel wire broke and caused the saw to spring forward toward this plaintiff."

The material allegations of the complaint are denied by the defendant's answer, and in addition it alleges that plaintiff was well acquainted with the construction and operation of said saw and appliances, and had the same means of knowledge of any defect that might exist in the steel wire as any other servant of the defendant, and that it was the duty of the plaintiff to see that the machinery and appliances were in good order and repair; and that the defendant and its servants used due care and diligence about the construction of said saw and its appliances, and had no knowledge of any defect therein prior to the happening of the accident; that in the selection of said steel wire it used proper precautions to procure safe, secure and suitable steel wire, and that said injury was not caused by any negligence of defendant, but was caused by the negligence of plaintiff himself.

When the plaintiff rested his case, the defendant moved

for a non-suit on the ground that his own evidence would not warrant a recovery, which motion the court denied.

The respondent had been at work on the trimming saw, in charge of it, about three months before the accident occurred, and had worked around and about its immediate vicinity for three weeks or nearly so before taking charge of it, and in all, had been employed about this mill for a period of some six weeks before he began to run the trimmer.

The evidence upon most of the points going to show negligence on the part of defendant was conflicting. The jury having found for the plaintiff must necessarily have found that the defendant was negligent, and the only point we shall consider is as to the negligence of the plaintiff himself, and this only from his own testimony. One Snyder was foreman of the mill, and put the plaintiff at this station without informing him, as the plaintiff claims, of the danger attending the situation, and when asked the direct question the plaintiff says that he did not know there was any danger connected therewith owing to his inexperience in operating machinery; that it was Snyder's duty to look after the mill and the machinery and see that it was in proper condition, and to instruct the men in their work. He claims no such instruction was given him, and that he was not informed by any one that it was a part of his duty to look after the particular part of the machinery which he was operating. His testimony does show that he knew how the machinery was constructed and operated so far as this saw was concerned, and it also appears he understood it was his duty to look after it to some extent at least, regardless of the fact as to whether he had been told to do so or not. In describing the saw and its appliances, and the manner in which it was operated, he testified:

"Well, it was a frame saw, a saw hanging onto a frame;

the frame was fastened up to the ceiling, I guess, and there was a wire rope to hold it back.

"Q. How did that rope run? A. It ran over to the wall and down stairs. It wasn't fastened to the wall; it was running down through the floor; through a pulley and under the floor there was another pulley, and the rope went through and over that pulley, and it went sidewise over to a lever.

"Q. What was that lever used for? A. Well, it was used for—they had a weight there.

"Q. How was this wire fastened to the arm of the pulley? A. Well, an iron wire, or steel wire, was up there, and there was another, a common rope, fastened to the wire rope.

"Q. What was the rope that was fastened to it? A. It was a manilla rope, I think, or another common rope.

"Q. How heavy was that weight at the end of the rope? A. One hundred and fifty pounds.

"Q. What did it consist of? A. Iron.

"Q. What was the condition of this rope, as far as you can remember; how was this rope? A. Well, it looked— it was dark, and it looked awful rusty and worn.

"Q. The steel wire? A. The steel wire; yes, sir.

"Q. And how was the rope? A. Well, the rope was worn pretty bad; it was dark."

He testified that the saw sometimes got out of repair when he was operating it, and that Snyder repaired it; also that Snyder looked over the machinery when he told him to, and that he had seen Mr. Benson operate the saw before he (plaintiff) took charge of it. In answer to a question as to whether he had not adjusted the weights in the story below, he testified:

" I guess I did try to fix it once, but I didn't understand the business, and so I didn't do much of it; I put in just a little piece of iron."

He was asked how long a time it was before he got hurt that Snyder repaired the saw, and answered:

" I told him that the saw wasn't quite right a good many times, and he has fixed it more than once."

He thought the last time was about two weeks before he got hurt. He further testified that the wire rope "looked dark and rusty like, and it was worn, I know, in a good many places." He also said there was nothing to prevent the saw from swinging forward in front of the rollers and striking him, if he was in front of it and the rope should break. The following question was asked him:

"You stated that, from a question put to you by counsel, that there had been no examination of this rope; suppose there had been an examination, could they have discovered the defects in this wire?" And he answered: "Yes, sir."

The following questions were asked him, and answers made by him:

"Q. You knew when you put the weights on the saw that it was an old piece of rope? A. Yes, sir.

"Q. How long was that before you got your arm hurt? A. Well, that was just after I started there.

"Q. And that old worn out rope, or worn rope, that you speak of, was on there about three months, then, before you got hurt? A. Yes, sir."

It clearly appears from the plaintiff's own testimony that he knew the bad condition of the wire rope, although he says that he did not suppose it would break. He knew, however, that it sustained a weight of one hundred and fifty pounds, and that if it broke when he was passing in front of the saw, as he says he was constantly required to do, that the saw would likely strike him in swinging forward. The plaintiff was a man thirty-three years old, and for aught that appears was possessed of ordinary sense. No one could operate this saw without appreciating the danger connected therewith in case the rope to hold it back should give way. It required no expert knowledge to apprize one of the fact that an old worn rope sustaining a weight of one hundred ond fifty pounds was in danger of breaking. The danger was apparent to the senses, and,

operating it under such circumstances as are shown in this case, he must be deemed to have assumed the apparent risk connected therewith.   *Anderson v. Akeley Lumber Co.,* Minn. 49 N. W. Rep. 664; *Berger v. St. Paul, etc., Ry. Co.,* 39 Minn. 78; *Russell v. Minneapolis & St. Louis Ry. Co.,* 32 Minn. 230; *Heath v. Whitebreast Coal & Mining Co.,* 65 Iowa, 737; *McGlynn v. Brodie,* 31 Cal. 377.

The testimony throughout the case shows that he knew as much, if not more, about the condition of the rope than any one else about the mill.   His own attempt to fix the saw by adjusting the weights, and his notifying Snyder at different times to repair it, show he understood that he had some sort of charge over the saw and its appliances, and that it was expected of him that he would notify the foreman when repairs were needed which he could not or should not choose to make.   He also knew Snyder's duties were as foreman to repair and supply machinery, and he testified that Snyder did repair this particular machinery when he asked him to.

The testimony as to any negligence upon the part of the defendant, through a failure upon the part of Snyder or at all, was conflicting as stated.   It was contended by the defendant that a new rope had been put on shortly after the plaintiff commenced work, and that there were no apparent defects in the rope which broke.   That Snyder had no notice or knowledge of any defect in it.   The plaintiff denied that the rope had been changed, but did not claim that he had notified Snyder of its unsafe condition.   He said that he did not think it would break, but that its old and worn condition would have been apparent to any one looking at it.   Under the law applicable to the facts appearing by the plaintiff's individual testimony there could have been no recovery.   The motion for a non-suit should have been granted.

The judgment is reversed, and the cause remanded with instructions to dismiss it.

ANDERS, C. J., and DUNBAR, HOYT, and STILES, JJ., concur.