[No. 6441. Decided December 6, 1906.]

W. F. BAILEY, *Respondent*, v. MUKILTEO LUMBER COMPANY, *Appellant*.[1]

MASTER AND SERVANT—NEGLIGENCE—ASSUMPTION OF RISKS. The doctrine of assumption of risks of danger from unsafety of the place, is not applicable to an unskilled man in a mill who is ordered from place to place, and from whom ready obedience is expected or necessary, unless the peril is so apparent that there can be no conflicting opinion between men of ordinary prudence.

SAME—CONTRIBUTORY NEGLIGENCE—INJURY TO SAWYER'S HELPER ON SPLITTER DECK. In an action for personal injuries sustained by a helper on a splitter deck while endeavoring, under directions from the sawyer, to dislodge a split log which had slid out of place, a nonsuit is proper on the ground of plaintiff's contributory negligence, where it appears that the injury was caused by the splitting of the log while endeavoring to dislodge it with a jack, that plaintiff had dogs which he might have used to prevent the splitting of the log, that logs frequently slid around in that way, and that he was familiar with the work and looked after the details.

Appeal from an order of the superior court for Snohomish county, Black, J., entered May 10, 1906, granting the plaintiff a new trial, after first granting the defendant's motion for a nonsuit, in an action by an employee for personal injuries sustained by the splitting of a log in a sawmill. Reversed.

*Cooley & Horan*, and *Brownell & Coleman*, for appellant.

*Hulbert & Bundy*, and *McMurchie & Locke*, for respondent.

DUNBAR, J.—Undertaking to abbreviate the respondent's statement of this case, which we think is practically justified by the testimony, respondent was employed by appellant in its sawmill as helper on the splitter deck. "Splitter deck" is the term used for that portion of the mill in which logs too large for convenient handling in the mill proper are sawed

[1]Reported in 87 Pac. 819.

lengthwise into quarters. The equipment of the splitter deck consisted of a saw carriage with a slot in the middle running through its length. Through this slot there ran a band saw. The operation of the splitter device consisted of the rolling of a log on the carriage so that its diameter was directly over the slot, and sawing the log lengthwise, cutting it into halves, with the exception that the saw was stopped twelve or eighteen inches from the end, leaving an unsawed length to hold the log together during further operations. The log was then turned and sawed again so that it would be quartered, again leaving an unsawed portion at the end. A chain was passed about the middle of the log, and by this means the log was rolled from the carriage through the open side of the mill and into a chute, thence into the water below.

The splitter deck at the time of respondent's injury was operated by one Fox (the sawyer) and respondent. At the time of the accident an unusually large log, with a crook or "belly," had been split into quarters. The chain was then passed under the log for the purpose of rolling it off the carriage and into the chute. By reason of the shape of the log, the chain could not be placed under its exact middle, but had been placed beneath one end. The drum was then started, but by reason of the sag in the log, it slued around, one end remaining on the carriage and the other lodging against a timber running along the outside edge of the deck. The deck at this point was thirty-two feet above the water, and there was no railing or guard upon its edge. Finding it impossible to roll the log out while in this position, it became necessary to straighten it so that it would be parallel with the carriage and with the edge of the deck. When the log became lodged, Fox, the sawyer, came down to examine the situation, and attempted to move the end of the log, which was resting on the carriage, with the chain, while the other end was held fast to the timber at the edge of the deck. After arranging the tackle, he went back to his station and tight-

ened up on the chain. The only effect was to raise .the outside end which was braced against the timber, so that it rested on the top of the timber. He again came down and said it would be necessary to take the log off with the jack. Respondent took the jack and started to place it against the end of the log, and Fox told him that that would split the log. Fox then took the jack and placed it against the side of the log, between the log and the outside edge of the deck, at a point two or three feet from the end. He .then told respondent to operate the jack while he went up and loosened the chain, which the respondent did. When the log slipped off the timber, the jar caused one quarter to break away and spring out in such a manner as to knock the respondent off into the water below, thereby receiving the injury complained of. This statement is substantially testified to by the respondent, the only testimony being that of the respondent and of Fox, the sawyer, who was called by the respondent. At the close of the testimony the appellant made a.formal motion for nonsuit. After considerable consideration by the court, the nonsuit was granted. A motion was afterwards made for a new trial, and the court determined that the nonsuit had been improperly granted, and granted respondent a new trial. From the order granting a new trial the defendant appealed.

The contention of the appellant is, that the respondent and Fox, the sawyer, were fellow servants; that the risk of the place in which he worked was assumed by the respondent, and that he was guilty of contributory negligence. Lengthy and elaborate arguments are made in the briefs of respective counsel on the subject of assumption of risk. The doctrine of assumption of risk is a difficult one to apply to an ordinary laborer in a mill or factory of any kind, for it must be considered with reference to another rule which ·is obviously a just rule, viz., that the servant when directed by the master to work in a certain place has a right to assume that he will not be exposed to unnecessary perils, or, in other words, that

such a direction or order implies an assurance of reasonable safety.  This must be true if it is the duty of the master to furnish a reasonably safe place—a proposition which is undisputed—and the servant has a right to assume that tne master will do his duty, which is equally well established.  It must be apparent to any one who reflects upon the situation that operatives, in large concerns especially, are not expected by their employers, when they are ordered here and there, to spend any time in examining the safety of the place in which they are ordered to work, but are expected to obey with alacrity; and this ready obedience is necessary for the systematic operation of the business and frequently for the safety of others.  In addition to this, it is a matter of common observation that the common unskilled man is not accredited with the capacity to determine the question of the safety of the place, but that such investigation and determination is made by or for the master when the general scheme or plan of operations is conceived and adopted.  Any other theory in law would be harsh and unjust.  Hence, the courts generally have decided that the servant will not be charged with assuming the risk of a place unless the peril is so apparent that there could be no conflicting opinion between men of ordinary prudence and understanding; and when this appears plainly, and then only, it becomes the duty of the court to hold that as a matter of law the risk was assumed.

But this case, it seems to us, falls more nearly within the rule of contributory negligence.  It must be seen at a glance that the place where the respondent was operating the jack was a very dangerous place, and that if the log split and flew apart there would be no probable way by which the respondent could escape injury.  He had worked on the splitter deck three weeks, and testified that he had learned all there was to learn about the work on the first day of his employment.  The testimony shows that the respondent used some "dogs" which were furnished to him to keep the logs from splitting; that

he knew their use and frequently used them for that purpose. He also testified that logs frequently slid around the way this log did. If the dogs had been used by him at this time it would have been impossible for the log to have split and the quarters to have detached themselves. He was familiar with the work and looked after the details or minutiae of the work, and having the appliances at hand and being familiar with their use, as he testified that he was, he saw fit to take chances on the splitting of the log, when he could have prevented it by a slight precaution. It is elementary that, if there are two ways in which work can be done, one a safe way and the other a dangerous way, and the operative chooses the dangerous instead of the safe way, he cannot complain if he is injured.

It is useless to discuss and analyze the multitude of cases that have been decided on this question by both this and other courts. In this case, having the means at hand to protect himself and neglecting to use such means, we think respondent cannot rightfully charge the disaster to his employer. The court in passing upon the question at the time the nonsuit was granted, said:

"The dangers, if any, were in the splitting of the log. That was a matter that was peculiarly, I think in this case, within the knowledge of the plaintiff. He was working with those logs; he knew the purpose of splitting the logs was so they would fall apart. He knew they were insecure. He was not directed as to the specific manner of doing the work. He had an opportunity of knowing that by putting dogs on the end, the splitting would be prevented, at least to a degree. He had the knowledge, and he had the right to put those dogs in."

This seems to us to be a fair presentation of the case, and we think the court was justified in granting the nonsuit asked for, and that it committed error in subsequently granting a new trial.

The judgment will therefore be reversed, with instructions to dismiss the case.

Mount, C. J., Crow, and Rudkin, JJ., concur.

Root, J., concurs in the result.

Hadley and Fullerton, JJ., took no part.