[No. 9444.    Department Two.    October 4, 1911.]

PATRICK TERRY, *Respondent* v. MERRILL & RING LOGGING COMPANY, *Appellant.*[1]

MASTER AND SERVANT—ASSUMPTION OF RISKS—PROMISE TO REMEDY CONDITIONS—EVIDENCE—SUFFICIENCY. A rigging slinger in a yarding crew of a logging camp assumes the risks of dangers from an unusual amount of brush about the logs and the failure of the swampers to properly complete their work and clear the brush away so as to permit the riggers to do their work with dispatch and safety, and he is not absolved by promises of the foreman to secure more men, if he could get them, made upon complaint as to the conditions, where it appears that the work of logging with the aid of a donkey engine is not customary until after the swamping is done, that swampers must keep ahead of the riggers, and that it would have been impracticable and unsafe to send in swampers to

[1]Reported in 118 Pac. 27.

remedy conditions while the riggers were at their work and logging operations were going on, and there was no promise made to suspend the logging in which the plaintiff was engaged when injured.

Appeal from a judgment of the superior court for King county, Yakey, J., entered September 14, 1910, upon the verdict of a jury rendered in favor of the plaintiff, in an action for personal injuries sustained by a rigging slinger in a logging camp. Reversed.

*Kerr & McCord* and *Hughes, McMicken, Dovell & Ramsey,* for appellant.

*Roberts, Battle, Hulbert & Tennant,* for respondent.

ELLIS, J.—Action for personal injuries suffered by respondent, resulting in the loss of an eye while working for appellant. The appellant was engaged in the logging business near Mukilteo, Washington. Its operations were conducted as follows: Men called fallers first fall the trees in a semicircle for a distance of about 1,000 feet from the point intended for the donkey engine. The trees are cut into logs and then trimmed by men called knotters, and the ends of the logs pointing towards the donkey are rounded by a snipper to facilitate dragging. Swampers are then sent in to swamp out rough roads or lanes fifteen or twenty feet apart radiating from the donkey site. The donkey engine is then set and the logs dragged in by a cable to a point near the donkey for shipment. The rigging slingers fasten the rigging to the logs and attach the main cable for hauling them in. The main cable is returned to the woods by a haul-back line passing through a block in the woods and over a drum on the donkey. This process is called yarding, and a yarding crew usually consists of about fourteen men.

On and prior to April 20, 1909, respondent, a man of thirteen years' experience, was a rigging slinger in one of the appellant's yarding crews. His duty was to handle the rigging in the woods, using a wire cable known as a choker,

with a hook and eye, which is placed about the end of each log for attaching the main cable. The choker weighs from forty to fifty pounds. The rigging slinger carries this choker upon his shoulders from the place where it is left by the main cable to the end of the log next desired. This work is required to be done quickly, as the donkey crew is idle until the log is attached. There were three yarding crews working out from the donkey. The hook tender of each crew was foreman of the crew, and there was a general foreman named Gabriel in charge of the three crews. Up to this point the facts are not controverted. Where the accident happened there were some 200 logs lying scattered in a hollow or depression about 400 feet wide. There was a dense undergrowth, and the logs were lying in and upon this brush. The respondent testified as to the conditions as follows:

"A. The brush all through this ground then was about eight or ten feet deep, limbs, and everything piled up around the different logs where we had to put rigging, all through the roads and everywhere; a man could not use no judgment at all where to walk; one place was the same as another."

Appellant's witnesses deny this, and say there was little more brush than usually encountered in such work, but it is admitted in the briefs that the brush was very deep and the conditions unusual. This brush had not been cut away from the ends of the logs by the swampers. Respondent's evidence tends to show that little if any swamping had been done. Respondent testified that on April 20th, shortly after 1 o'clock, while at his work as a rigging slinger, in order to fasten his rigging to the end of one of these logs it was necessary for him to clamber over a pile of this brush on which the log lay, with the choker upon his shoulder, when the brush caved in or broke under him, causing him to fall, his eye striking a limb or knot upon the log and piercing the eyeball. Briefly, the negligence charged is the failure of appellant to have swampers and knotters to remove brush and

debris from the ends of the logs so that the rigging slinger could safely approach them, carrying the choker, and attach the rigging with the speed required in the work.    That the place of work was thus made dangerous.    There was denial of negligence or unusual danger, and the defenses of contributory negligence and assumed risk were interposed.

Respondent claims that he went to work in that place and continued his work upon repeated promises of the general foreman of appellant to get more men to clear away the brush.    Until two or three days prior to April 20th, respondent had been working in another yarding crew some distance from the place of the accident.    Gabriel, the general foreman of the three crews, took him from this crew to the place in question, where one Rooney was hook tender and foreman of the yarding crew.    It seems that some of the men who had been working there had quit on account of the conditions.    Respondent testified as to this transfer and promise to remedy conditions as follows:

"Q.  Who took you from Jack Royce's yarder to Mr. Rooney's yarder?  A.  Jesse Gabriel, the foreman of the camp.    Q.  What conversation did you have with him at that time?    That is, with reference to the change?    A.  When we were working over from Royce's side, the other side, I says, what is the matter over there?    And he says, I don't know; I cannot keep anybody over there; I guess that is a hell of a hole for a man to work in.    Mr. Kerr:  What is that?    A. He says, I guess that is a hell of a hole for a man to work in; no one seems to stay there at all.  .  .  .  A.  He says that is a hell of a hole for a man to work in; the crew has all quit there; there is no one left there but the chaser and the hook tender.    Q.  What did you say?    A.  Well, I said, then, that is a poor place to be putting me.    Q.  Did you make any objection to going over there at that time?    A.  Yes; and he says, go ahead.    Q.  What did you say?    A.  Well, I says, I don't care to go over, I believe I would as soon go to camp. Q.  What did you mean by that?    A.  That I would quit.  .  . Q.  Now, go ahead, Mr. Terry, and say what occurred at that time between you and the foreman?    A.  Well, he says,

you go down there and go to work, and I will go and rustle some more men to work there with you. Q. And you did go down to work? A. And we walked down there together and he says, I will get some more men right away if I can; and I says, all right, I will start in until you get someone else; and he says, do the best you can, and I says, all right, I will; and on those terms and conditions I went in there."

In describing the number of swampers usually employed and the nature of their work, he testified as follows:

"A. The swamper's duties, it is—the head swamper has two second swampers under him and a chunk cutter. It is the duty of these men, to cut the chunks and stuff out, and put roads in to these logs, and swamp them out and clean the brush and chunks out so the rigging crew, when they come in to do their work, can do it as fast as they are compelled to. You do not have all day to put on these chokers. You are forced into your work by steam and by a foreman looking after you. You are not allowed to take all day to put this rigging on. If these swampers do their share of the work, there is no danger, for they eliminate this danger, it is all right; but where we were there was eight to ten feet of brush, and nothing was touched; and we were very shy of men, shy about six men in this crew at this time when I made this complaint."

He testified that he made complaint to the hook tender, Rooney, when first placed in his crew, and that Rooney said: "The conditions are bad here, I know, but we will try and better them and try to get more men if possible;" that next morning he again talked with Gabriel, who promised to have more men sent in if he could get them; that the day before the accident, the brush broke under him and he received a slight wound in the groin, and next morning he again complained to the foreman, Gabriel. His testimony as to this is as follows:

"A. I asked him, did he have any more men to go down on that side that day; and he says I will get them as soon as possible; get them right away now, if I can. I will try and rustle up some right now; and with that, he turned back, and

we proceeded ahead and went to work, and expected to see some come down, which failed to come."

The hook tender, Rooney, also testified that respondent complained to him several times, and he reported the matter to Gabriel, who stated that he would get more men if he could.    Gabriel, the foreman, denies that any such complaint was ever made to him by any one, and denies. that he ever made any such promise as claimed by the respondent.  Nearly all .of the witnesses testified that in practical logging the number of swampers and knotters required in the yarding of logs would depend upon the particular situation, the character of the timber, and the amount of brush and undergrowth.    The highest number mentioned by any witness being four, in this agreeing with respondent's testimony above quoted.    Both the respondent and his yarding foreman, the hook tender, Rooney, testified that there were no swampers or knotters in Rooney's crew, and that the swamping had not been properly done.    They both testified that it was usual to clear away the brush from the ends of the logs to enable the rigging slingers to approach and attach the choker with the necessary haste.    Seven witnesses, all practical loggers of wide experience, testified that no such custom existed.    Some of them testified that swampers are seldom employed where the logging is done with the aid of a donkey engine, and when done it is only to the extent of clearing out rough roads to facilitate the dragging of the logs, but never to and around the ends of the logs from such roads.    All of the witnesses, both for appellant and respondent, agree that when the swamping is done it is customary to do it before the work of.yarding the logs is begun.    Both the respondent and the witness Rooney stated that if not done before, it was sometimes carried on at the same time, but so as to keep in advance of the yarders.    The witness Rooney testified as follows:

"Q.  Now, ordinarily, when that work is done in the usual

way, when are the swampers put in there to work? A. They are supposed to be about a week or ten days or a couple of weeks before the yarding crew. Q. What do they do.with reference to the work? What do they do there? A. They see the log is cleanly swamped out so the rigging men can handle them. Q. Now, that is done a week or two ahead of the yarding crew? A. Well, that is the general rule they do that; now lots of times they don't do it. Q. Yes, I know; but that is the rule? A. Yes. Q. Now, the purpose of their going in there, and cleaning it out is so the rigging crew can get to the logs? A. Yes, sir. . . . Q. Now they did not do the swamping while the donkey engine is there; that is all done before bringing the donkey engine up? A. They do, lots of times; that is, they do swamp while the rigging slingers are working; but that is dangerous for that work. Q. But the usual way— A. No place for the men to work, and the rigging to be put around the log, if the swampers are there, for the swamping to be done around the line when it is hauling logs out. Q. That is not the proper way to do it, to have swampers in there while there is logging going on? A. No, sir. Q. Then, as a matter of fact, the way in which this work departed from the customary, or from the ordinary and usual way, that they had not had it swamped out before they put the donkey engine in there to snake out the logs? A. No, sir."

On the whole, it is fairly apparent from the evidence that the swamping had been only partially done; that there were at the time no swampers or knotters in Rooney's crew; that the custom of swamping is not primarily intended as a measure of safety to the men, but mainly to facilitate the work of hauling the logs; that the ground in this particular place was dangerous on account of the brush; that the danger was so apparent that it was as well known or even better known to the respondent than to the appellant, and that it would have been impracticable to have swamped out a road to and about the end of each log so as to render an approach to it safe without the employment of a large force of men for several days; that the brush was, as shown by the respondent's

testimony, eight or ten feet deep all over the depression, and that the end of the log in question, had the brush been cleared away, would have been eight or ten feet above the ground. It is not claimed that the respondent went to work or continued at work relying upon the superior judgment of the foreman that the danger was not great. Respondent admits that he knew and appreciated the danger fully. It is admitted that he assumed the risk of injury unless he received a promise upon which a reasonably prudent man would have relied.

The appellant contends that the rule which absolves an employee from assumption of risk does not apply to the place of employment, but only to cases where tools, machinery, or other appliances are used, and the promise is to repair or adjust such appliances. While a majority of the reported cases arose upon a promise to remedy defects in tools or machinery, the rule must logically be held to apply to a promise to remedy defects in the place of work as well as defects in tools or machinery. The logical basis of the rule, as it seems to us, is found in an implied contract. 1 Labatt, Master and Servant, § 424. It is first implied from his acceptance of his employment that the servant assumes the risks of dangers open and apparent of which he has equal knowledge and appreciation with the master. But when he complains and the master promises unconditionally to remedy a defect, either in the place in which or the appliances with which he requires the servant to work, there arises another implied contract that the master assumes the risk during such time that the servant might reasonably expect that the promise would be kept, unless the danger is so imminent that a person of ordinary prudence would not accept the risk even on the promise. But whatever the basis of the rule, this court has stated it broadly as applying to the place of work as well as to appliances, and we think that position sound. *Morgan v. Rainier Beach Lumber Co.*, 51 Wash. 335, 98 Pac. 1120, 22 L. R. A. (N. S.) 472; *Beseloff v. Strandberg*, 62 Wash. 36, 113 Pac. 250.

In the case before us, however, the testimony of the respondent himself presents an insuperable obstacle to his recovery. From his testimony it is plain that the conditions were such that they could not have been remedied so as to make the place safe without suspending the work of hauling the logs until practically all of the logs had been cleared of the brush so that each could be reached by the rigger without danger. There was no promise to suspend the work, but only a promise to secure more men. No prescience could anticipate that it was this particular log that would have to be cleared to avoid an injury. To have performed the promise, as now construed by the respondent, with any avail, would have required swamping to and about the end of each log by removing from eight to ten feet of tangled brush—a work which would have taken four swampers an hour to each log, according to respondent's testimony. This would mean a work of twenty days of ten hours each for four swampers, and in order to keep in advance of the riggers while the hauling was in progress, would have required many men, if practicable at all. It is plain from the evidence that the promise was not so understood by either party. If not so understood, it was a promise the performance of which could not produce safe conditions, and was not such as to absolve the respondent from the assumption of risk. There was no promise, upon which the respondent had a right to rely, that the conditions would be materially improved if the work of hauling logs was not suspended. And the respondent does not claim that there was a promise to suspend or that he expected a suspension of the work. The danger was so obvious, the promise so inadequate to relieve it under the known conditions, that the respondent must be held to have accepted the risk, which he admits he assumed but for the promise.

It is urged that the case of *Beseloff v. Strandberg, supra,* is conclusive of the question here involved. We think not. In that case the promise was to do a specific thing, which

when done would at once remove the specific danger.   Here the promise was merely to send in more men if they could be procured, which would not have remedied conditions without a suspension of the work of hauling for a considerable period of time.   Even then the evidence leaves it wholly unexplained how the rigging slinger could have reached the ends of the logs, which the respondent testified would be left lying on the brush eight or ten feet above the ground.   It seems plain that it could only be done by climbing upon the brush, or by the master furnishing some other means of reaching the log safely after the swamping.

The judgment is reversed, with direction to dismiss the action.

Gose, Crow, Morris, and Chadwick, JJ., concur.