[No. 28821. *En Banc.* June 24, 1943.]

C. Paul Cummins, *Respondent,* v. Dulcina Dufault, *Appellant.*[1]

[1]Reported in 139 P. (2d) 308.

*Bruce Bartley* and *Max R. Nicolai,* for appellant.

*James V. McCabe* and *Don M. Tunstall,* for respondent.

SIMPSON, C. J.—The plaintiff brought this action to recover compensation for personal injuries sustained

while working for the defendant in a hop kiln. In his amended complaint, plaintiff alleges that he was employed by defendant during the month of August, 1940; that, as a part of his duties, he assisted in moving hops from the drying room and dumping them in a bin in an adjoining room; that his work was done with large shovels or scoops, provided for that purpose, which were filled with hops in the drying room and pushed by the operator over a wooden tramway and dumped into open bins alongside; that the drying room and the tramway were approximately twelve feet above the floor of the bins. It was further alleged that, on the opposite side of the tramway from the bin into which the hops were dumped, defendant had attached burlap to a height of two or three feet to prevent the hops from falling into the bins on that side. Plaintiff alleged that defendant directed him to perform the work with three other workmen, although he had never had any experience in working in a kiln and knew nothing about its operation, and that defendant gave him no instruction as to his duties or any warning of dangers incident thereto; that, five minutes after commencing his work, he

" . . . miscalculated the position of the west edge of said tramway and stepped on the edge thereof and his foot slipped therefrom, causing him to plunge headlong"

onto the floor twelve feet below, where he sustained serious injury. His charges of negligence were that defendant did not furnish him a safe place to work and did not warn him of the dangers and defects of the tramway in that it did not have guard rails; that the burlap permitted hops to accumulate and hide the edge of the tramway; that the flooring of the tramway was nailed insecurely and there was no sufficient support underneath, which permitted it to "give and bend when walked upon"; that these dangers were known to defendant and not to plaintiff.

Defendant answered by way of general denial, and set up the affirmative defenses of contributory negligence, assumption of risk, and the fellow servant doctrine.

The cause came on for trial before a jury, and resulted in a verdict for plaintiff. At appropriate times, defendant challenged the sufficiency of the proof submitted by plaintiff by motions for nonsuit and for judgment n. o. v. The motions were denied, and judgment was entered upon the verdict. Defendant has appealed.

Her assignments of error are in denying the motion for nonsuit and for judgment notwithstanding the verdict.

In passing upon the issues involved in this case, we recognize the rule that respondent is entitled to the benefit of all the evidence and the reasonable inferences therefrom in support of his judgment; and, in considering the evidence, we must exclude all that is contrary or in conflict. In other words, before we can set aside the judgment, it must appear that reasonable men must conclude that the evidence does not establish liability. *Knight v. Trogdon Truck Co.*, 191 Wash. 646, 71 P. (2d) 1003; *Johnson v. Watson*, 11 Wn. (2d) 690, 120 P. (2d) 515.

With this rule in mind, we summarize the evidence most favorable to respondent.

Respondent, twenty-seven years of age, commenced to work for appellant the day before the accident. This work consisted of hauling hops and cleaning the hop kiln preparatory to the drying of hops. Although he had never worked in a hop kiln before, respondent had worked on a farm from boyhood, and had spent about two months in pruning, training, and packing hops.

The kiln in which the accident occurred was an L-shaped building, the top of the "L" facing in a southerly direction. There was a large kiln and a small kiln on

the second floor of the building. The large room was thirty by thirty feet in dimensions. There was a platform on the west side of the building with a door opening into both kilns. A wooden tramway led out of the door located in the middle of the north wall of the large kiln and extended the full length of the building. This tramway or walk was slightly less than six feet in width at the door of the large kiln, and widened to a little more than six feet about nine or ten feet from the doorway. There was an elevation of about a foot in this distance. A ventilator was located in the ceiling about the middle of the building, and an electric light was placed near the ventilator. Burlap was nailed along the west side of this tramway, extending from the door opening into the drying room for about nine or ten feet and at a height of two or three feet. The piece of burlap had laths along the top, which in turn were nailed to the side of the large kiln at the west side of the door and to an upright which was about nine feet north of the kiln. The burlap hung in a loose manner, "not taut," as the witnesses said; but neither did it sag materially.

The evidence shows that the purpose of putting the burlap along the west side of the tramway was to prevent the hops that were being pushed along the tramway from falling into the west bin. This testimony further shows that the hops were pushed along the tramway, and that, as they fell to the side of the sled as it was being propelled in a general northerly direction along the runway, they fell off the sled to each side. Those which fell to the west were pushed over against the burlap, which increased the pressure on the burlap, causing it to sag, and allowed a pocket to form immediately west of the western edge of the runway. At the time of the accident, the lower portion of the burlap was covered with hops to a depth of several inches.

In the afternoon of the day of the accident, respondent and three other men were directed to "push" the

big kiln, which meant moving the dried hops to the open bins where they remained before baling. The work consisted of scooping the hops into a large wooden scoop and pushing them ahead over the tramway and then dumping the hops into a large bin on the east side of the walk. Respondent and his fellow workmen entered the kiln from an outside door and then proceeded to move the hops. Respondent and two others did the pushing, and the fourth man swept up after them. About fifteen or twenty minutes after the work commenced, and when the kiln was about one-half or two-thirds empty, respondent, after pushing a scoop full of hops out of the dry kiln along the tramway to a point about seven feet from the door, slipped and fell off the walk through the burlap to the floor twelve feet below. At that time the other workmen were inside the drying room and did not see the accident.

Respondent testified that he was about twelve inches west of the center line of the walk when he slipped and fell over the side, the upper part of his body striking the burlap first.

By its instructions, the court withdrew from consideration by the jury the issue raised by the pleadings concerning any defect in the walk by reason of lack of railing or its being insufficiently supported. The only issue of negligence which the jury were permitted to consider was whether or not appellant had failed in her duty properly to instruct and warn respondent of dangers in the work which were not apparent to respondent, and in not providing him a safe place to work, by reason of the fact that the burlap allowed a deceptive situation to arise during the progress of the work which misled respondent into thinking that the walk was wider than it actually was. His contention on this appeal is that appellant was negligent in not warning him of the danger of slipping on the walk while pushing hops, and in nailing the burlap along

the west side of the tramway in a position which allowed hops to pile up along its side during the progress of the work.

It is our conclusion that respondent assumed the risk of the dangers incident to his employment and was guilty of contributory negligence. It is a master's duty to furnish his servant with a reasonably safe place to work. This is a positive duty resting on the master by virtue of the relationship of master and servant and one which the servant can assume the master will meet. *South v. Seattle, Port Angeles & Western R. Co.,* 99 Wash. 51, 168 Pac. 896; 39 C. J. 308, § 441, Master and Servant.

The reciprocal obligations of the master and the servant are well stated in *Nordstrom v. Spokane & Inland Empire R. Co.,* 55 Wash. 521, 104 Pac. 809, 25 L. R. A. (N.S.) 364:

"When the relation of the master and servant is sustained, the law implies and fixes upon each certain duties and responsibilities, which are reciprocal in their nature. These duties, in so far as they relate to the case before us, are that the master shall furnish the servant with a reasonably safe place in which to work, and shall take the precaution of an ordinarily prudent man in keeping the place reasonably safe. He shall furnish the servant with proper tools and appliances that are reasonably safe for the use required of them, and use ordinary care in so keeping them. He shall, in case of any latent or hidden danger known to him and unknown to the servant, apprise the servant of the existence of such danger and the possibilities of consequent injury, and he shall employ such only as have sufficient intelligence to comprehend the danger, if any, of the situation. Having thus acted, he has fulfilled his full duty to his servant, and the servant in his turn takes upon himself the obligation of using such care and precaution for his own safety as an ordinarily prudent man would use under like circumstances, and assumes the risk of injury from obvious and apparent dangers; and the same force of reasoning which holds the servant to assume the risk of only obvious and apparent dangers, releases the master from liability from

dangerous conditions or situations of which he has no knowledge, or of which he could not acquire knowledge in the exercise of ordinary diligence on his part."

■ Assumption of risks relieves a master of liability for injury resulting from ordinary dangers of the work involved, and in all other instances where the danger is open and apparent. It is well expressed in the oft cited case of *Gila Valley, G. & N. R. Co. v. Hall,* 232 U. S. 94, 58 L. Ed. 521, 34 S. Ct. 229:

"An employee assumes the risk of dangers normally incident to the occupation in which he voluntarily engages, so far as these are not attributable to the employer's negligence. But the employee has a right to assume that his employer has exercised proper care with respect to providing a safe place of work, and suitable and safe appliances for the work, and is not to be treated as assuming the risk arising from a defect that is attributable to the employer's negligence, until the employee becomes aware of such defect, or unless it is so plainly observable that he may be presumed to have known of it. Moreover, in order to charge an employee with the assumption of a risk attributable to a defect due to the employer's negligence, it must appear not only that he knew (or is presumed to have known) of the defect, but that he knew it endangered his safety; or else such danger must have been so obvious that an ordinarily prudent person under the circumstances would have appreciated it." [Quoted with approval in *McPherson v. Twin Harbor Stevedoring & Tug Co.,* 139 Wash. 61, 245 Pac. 747; and *Peterson v. Tacoma-Ashford Transit Co.,* 170 Wash. 594, 17 P. (2d) 35.]

■ We find many cases involving this question, but to quote from them to any great extent would not be possible. As said in *Beltz v. American Mill Co.,* 37 Wash. 399, 79 Pac. 981, this question, as in all cases involving negligence and contributory negligence, depends upon the facts and circumstances in each particular case, and the decisions of other cases are important only as they lay down or establish general rules or principles. If an employee undertakes a haz-

ardous employment, he is said to assume the hazards inherent normally in the work involved, this being considered an ordinary risk of employment. *Nordstrom v. Spokane & Inland Empire R. Co., supra; Shore v. Spokane & Inland Empire R. Co.*, 57 Wash. 212, 106 Pac. 753; *Hartford v. Northwestern Stevedoring Co.*, 148 Wash. 501, 269 Pac. 831.

A servant assumes the extraordinary risks if they are open and apparent, although due directly to the master's negligence. *Jennings v. Tacoma R. & Motor Co.*, 7 Wash. 275, 34 Pac. 937; *Olson v. McMurray Cedar Lbr. Co.*, 9 Wash. 500, 37 Pac. 679; *Griffiths v. Craney*, 38 Wash. 90, 80 Pac. 274; *Mercer v. Lloyd Transfer Co.*, 59 Wash. 560, 110 Pac. 389; *Lahti v. Rothschild*, 60 Wash. 438, 111 Pac. 451; *Kahlstrom v. International Stevedoring Co.*, 141 Wash. 374, 250 Pac. 287, 256 Pac. 503.

While it is necessary that the danger be understood or comprehended by the servant as well as the facts of its condition which are apparent to him (*Lahti v. Rothschild, supra; Engelking v. Spokane*, 59 Wash. 446, 110 Pac. 25, 29 L. R. A. (N. S.) 481), the servant must, however, use his senses. He cannot plead ignorance of conditions which he as an ordinarily prudent person should have observed. *Ford v. Heffernan Engine Works*, 48 Wash. 315, 93 Pac. 417. It is his duty to take note of his surroundings and make such examination as an ordinarily prudent person would make under the same or similar circumstances.

In *Olson v. McMurray Cedar Lbr. Co., supra*, the workman was injured by coming in contact with an exposed cog in the machinery of a lumber mill which he did not notice. He had been employed for three days inside the mill, and said that he did not know the cog was uncovered. He contended that the owner owed him a duty to instruct and warn him of the condition. In passing upon the contention, this court said:

"Men, when they are working around dangerous machinery, must notice. Their faculties and senses

are given them for the purpose of self-preservation, and they must exercise them to a reasonable extent. The testimony of this man shows that he knew where all the live rollers were, and that in every live roller there was a cog, and that he knew that if his hand came in contact with the cogs he would be hurt; and it seems to us that the very slightest prudence on his part would have saved him from the results of this accident. It makes no particular difference whether it was one of the rollers that was three feet from the ground or the roller, as claimed by the respondent, that was ten inches from the ground. Three days' observation of this machinery around which this man was working would naturally make him acquainted with the location of all the cogs; and if he did not exercise discretion or thought or care enough and pay sufficient attention to their location to know where they were, he cannot complain if by reason of such heedlessness he is damaged.

"The dangers in this instance were apparent, and the law is well settled that an employee when he assumes his employment takes the risk of all apparent danger. This was the doctrine announced by this court in *Week v. Fremont Mill Co.,* 3 Wash. 629 (29 Pac. 215), and *Jennings v. Tacoma Ry. & Motor Co.,* 7 Wash. 275 (34 Pac. 937), and is the doctrine of common justice and right between employer and employee, and the doctrine of common sense."

Accord: *French v. First Ave. R. Co.,* 24 Wash. 83, 63 Pac. 1108; *Smith v. Hecla Mining Co.,* 38 Wash. 454, 80 Pac. 779; *Woelflen v. Lewiston-Clarkston Co.,* 49 Wash. 405, 95 Pac. 493; *Soderburg v. Wells,* 57 Wash. 281, 106 Pac. 751; *Mayer v. Queen City Lbr. Co.,* 64 Wash. 567, 117 Pac. 392; *Saunders v. Longview, Portland & N. R. Co.,* 161 Wash. 280, 296 Pac. 835.

In the *Soderburg* case, the court said:

"We must look to the conduct of the average prudent man for the standard of due care, and by that standard the duties and obligations of both the master and the servant must be measured and determined."

The rule as found in all texts and citations is in much the same language.

"He [the servant] will not be heard to say that his ignorance of a danger was excusable if it could have been discovered by a reasonable use of his faculties of observation." Labatt's Master and Servant (2d ed.), vol. 4, p. 3827, § 1336.

This rule applies to a situation where the opportunity of observation is equal to master and servant alike. *Deaton v. Abrams,* 60 Wash. 1, 110 Pac. 615, 47 L. R. A. (N. S.) 266; *Terry v. Merrill & Ring Logging Co.,* 65 Wash. 225, 118 Pac. 27; *Cole v. Spokane Gas and Fuel Co.,* 66 Wash. 393, 119 Pac. 831; *Brandon v. Globe Inv. Co.,* 108 Wash. 360, 184 Pac. 325, 10 A. L. R. 286; *Jones v. Baker,* 179 Wash. 25, 35 P. (2d) 1103.

In order to show that the respondent in this case knew of the condition confronting him when he started to move the hops into the bin, and that he assumed the risk of the work which he was doing, we quote from his testimony as follows:

[Direct examination]

"Q. The four of you fellows were told by Mr. Dufault to go up and push the kiln? A. Yes. Q. Now, the term, pushing a kiln, means taking and pushing the hops out of the drying room and storing them in the bin? A. Yes. Q. What did you do on ascending the stairway and after the doors were open? A. Well, Chuck King and that other boy and myself, we got them three sleds and went around and started pushing the kiln. Q. Now, you pushed, I believe you showed the jury, onto that big runway? A. Yes. Q. Now, this runway, Mr. Cummins, are there any rails on that? A. No. Q. Was there anything on it? A. That burlap sack was on the bottom. Q. The jury doesn't know anything about a burlap sack except what little I have told them. Will you explain that? A. Well, there was burlap sack. It was tacked on the bottom of the runway and was up, oh, possibly—about two feet high from the runway, it run up about two feet high to keep the hops from spilling over into this bin here when you were putting them in this one. Q. Which bin were you going to put those hops in, by the way? A. This big one. Q. Which way did this burlap sacking run? A.

Along here, this side of the runway. Q. Now, how was it tacked to the runway? A. It was tacked underneath the bottom of the runway and was up about two foot high. Q. Well, did this burlap just stand up there by itself, like a dog's tail? A. No, it was tacked with laths along the top of it that held it up so high. Q. Where were they tacked to? A. Tacked to the side of the—up here, next to the kiln and on that other post. Q. Point with the pointer. A. It was tacked up here and over on this post that stood up here in the kiln. Q. Which post? A. This post here (indicating). There was a post right here. This here was—this there had straight along here out to here, and then this—Q. (Interposing) We are not interested in this, that runway at the present time. The sacking was tacked to the bottom and to the post on one end and to the wall on—right by the door of the entrance? A. Well, it was tacked on the bottom through here. Q. Yes. A. And then it was up here, oh, approximately two or three foot high and there was laths tacked here to this post, then over here was sort of a two by four, I guess, up along the side of the bin on the inside and it was tacked to it. They were tacked so it held them up about two or three foot high. . . .

"Q. Now, in what position, position up and down, was this burlap sacking, Mr. Cummins? A. Well, I took it to be—it was more like straight up and down. Q. Was it in a taut— A. (Interposing) No. Q. Or it wasn't just like that would be? A. No. Q. How much did it sag? A. Oh, not an awful lot but it kind of sagged out a little. . . .

"Q. Now, had you, at this time—Was the platform clean? A. No. Q. When you started, that is? A. Yes. Q. It was clean at that time. Then you took this scoop and started to push hops into that? A. Yes. . . .

"A. (Continuing) . . . I was about seven feet from the door, when my foot slipped and I fell and instead of hitting what I figured would be the floor, I hit the hops but went right on through to the floor. Q. How did it come you thought you were going to hit the floor? A. Well, it was like the floor under me, I took it to be floor, but there was nothing but that burlap sacking backed out. When I hit the hops, that burlap sacking didn't hold me; I went right on through. . . .

"Q. How come you slipped? A. Well, I was pushing hard against that there hop sled and my foot slipped and I fell. . . .

"Q. Had you noticed that this sacking had bulged out with the weight of these hops? A. No. . . ."

[Cross-examination]

"Q. When that bulkhead was moved, you could look right out on that runway, couldn't you? A. Yes. Q. Were there a few hops spilled out there when the bulkhead was pulled out? A. Not very many at that time. Q. Standing there, you could look right out and see the runway. Was the burlap tacked up then? A. Yes. Q. And you could see the burlap? A. Yes. Q. And see it was tacked up? A. Well, I never paid any attention to it. Q. Didn't pay any attention. You saw it, though? A. Yes. Q. Now, that runway is about the same width as the door, isn't it? A. Yes. Q. Just maybe a little bit wider? A. Yes. Q. And the day of the accident, the burlap was tacked up on the west side? A. Yes. Q. Toward Dufault's house? A. Yes. Q. And there was no burlap tacked on the east side? A. No. Q. That's where you were dumping the hops, into the east side? A. Yes. Q. And the walk is the same distance from the doorjamb on the east side as it is on the west side, isn't it? Well, skip that. I'll go about it another way. You remember that the runway does—it is just a little bit wider than the doorjamb? A. Well, I never paid no attention to that. Q. Almost the same width as the door? A. Almost the same width? I know it is the same width as the door. Q. In other words, the same situation is presented on the east side of that doorway as on the west side? A. Yes. Q. And the burlap was only tacked up on the west side? A. Yes. . . .

"Q. Would you say that you'd made less than fifteen trips from the kiln to the storage room? A. I don't know how many I'd made. Q. You had made more than four, hadn't you? A. Yes, I reckon I had. Q. You might have made ten? A. Yes. Q. You were just there for fifteen minutes, walking in, loading, going back, unloading, returning? That is all you were doing? A. Yes."

If the condition of the walk due to the burlap condition contributed to his fall, it was a condition

which he assumed when he undertook the task assigned to him. He saw the tramway when it was clear of hops, and it was his duty to notice the condition. The fact that the hops accumulated and bulged the burlap out six to twelve inches was a readily observable fact during the progress of the work, a condition brought about in part by respondent's own efforts, and it must be charged to his attention.

As this court said in *Boyle v. Anderson & Middleton Lbr. Co.*, 46 Wash. 431, 90 Pac. 433:

"It, however, appeared that appellant was in a position to observe the constant, gradual change produced by means of the sawdust, bark and refuse falling and remaining upon the floor, . . ."

See, also, *Smith v. Hecla Mining Co.*, 38 Wash. 454, 80 Pac. 779, in which this court held that it was the duty of the servant to ascertain and protect himself against dangers that were liable to occur. In this case, we cited the Iowa case of *Oleson v. Maple Grove Coal & Mining Co.*, 115 Iowa 74, 87 N. W. 736, which stated:

"The doctrine that the master must provide a safe place has no application to a case where the place becomes unsafe during the progress of the work. As to such danger, the law only requires reasonable care to employ competent men and provide suitable material. . . . The employee 'is bound to take notice of the ordinary operation of familiar natural laws, and to govern himself accordingly. Failing to do so, he takes the consequences. He cannot charge such consequences upon the master, when he can see that which is open and apparent to a person of ordinary intelligence.' "

In *Boyle v. Anderson & Middleton Lbr. Co., supra,* this court held a workman to the duty of observing the condition of the accumulation of sawdust and debris on the floor which accumulated during the course of the work; and, again, in *Gessner v. Ramwell*, 140 Wash. 78, 248 Pac. 61, this court held that the stevedore plaintiff assumed the risk when he slipped on fresh paint used to mark consignments of lumber which he was

stowing in a cargo vessel. It was customary to mark the lumber in that manner, and the plaintiff had seen it done. In passing, it was stated:

"The strip of paint on which appellant slipped was a very narrow one and was perfectly obvious and apparent to him. He testified that his eyesight and all his faculties were good; that he had worked all day and traversed these paint strips all that time."

■ A workman cannot rely on his ignorance or the failure of the master to warn him of danger in order to excuse himself of contributory negligence any more than an assumed risk. It is sometimes hard to distinguish between the two situations, and the terms in many cases are often used interchangeably. However, in both instances, the servant must observe his surroundings and protect himself.

In *Vianello v. Washington Iron Works Co.*, 55 Wash. 552, 104 Pac. 784, the plaintiff was found guilty of contributory negligence when he placed his hand between flasks or iron moulds on a hand car being pushed into a furnace. The operation took several men, and it was customary to call workmen from their posts to assist. The foreman always warned the men against doing the very thing this plaintiff did, to his injury. He contended that he was an inexperienced workman and could not understand or speak English and was unable to understand the warning given by the foreman. This court said:

"It is difficult to understand how the respondent could fail to see these large moulds, to observe the manner in which they were placed upon the car, and appreciate that the only danger to which he would be subjected in doing the work would result from inserting his hand between the flasks."

■ A servant is guilty of contributory negligence in continuing to work under conditions which become dangerous during the course of the operation, and in not taking common, ordinary precautions for his own safety.

In *Beltz v. American Mill Co., supra,* this court held that a man was guilty of contributory negligence in not stopping a saw before attempting to remove sawdust, the danger being apparent and obvious. See, also, *Bailey v. Mukilteo Lbr. Co.,* 44 Wash. 581, 87 Pac. 819; and *Mercer v. Lloyd Transfer Co.,* 59 Wash. 560, 110 Pac. 389.

 This leaves for our consideration the question of whether or not appellant may be held accountable for failure to instruct and warn respondent. Instruction as to his duties, it is quite apparent, was not necessary. The accident did not occur because respondent did not know how to perform the task. There were no tricks of the trade to learn in order to keep from falling. He says, however, that he did not know about lupulin, nor appreciate the danger of slipping on account of it. As has been stated, the master owes a duty to his servant to warn him of danger connected with the work which a man of ordinary prudence could not comprehend from the operation involved.

However, there is no duty to warn against an obvious danger. *Watts v. Hart,* 7 Wash. 178, 34 Pac. 423, 771; *Jennings v. Tacoma R. & Motor Co.,* 7 Wash. 275, 34 Pac. 937; *Olson v. McMurray Cedar Lbr. Co.,* 9 Wash. 500, 37 Pac. 679; *French v. First Ave. R. Co.,* 24 Wash. 83, 63 Pac. 1108; *Woelflen v. Lewiston-Clarkston Co.,* 49 Wash. 405, 95 Pac. 493; *O'Dell v. Northern Coast Timber Co.,* 63 Wash. 546, 115 Pac. 1085; *Broughton v. Oregon-Washington R. & N. Co.,* 138 Wash. 298, 244 Pac. 558.

In the *Woelflen* case, this court quoted from Thompson, Commentaries on the Law of Negligence, vol. 4, p. 288, § 4063, as follows:

"The master is not under any duty to warn or instruct servants who have already enjoyed an ample opportunity to become acquainted with the danger. Servants are expected to keep their eyes open and exercise such a reasonable care for their own safety as their situation permits."

 Where the dangerous condition arises in the course of the work and occurs as the result of well-known operations of natural forces, it is considered an open and obvious danger, placing upon the servant the duty of taking proper precautions for his own safety. *Props v. Washington Pulley & Mfg. Co.,* 61 Wash. 8, 111 Pac. 888, 45 L. R. A. (N.S.) 658; *Kancevich v. Cudahy Packing Co.,* 184 Iowa 799, 169 N. W. 186; 39 C. J. p. 500, § 612.

In the Corpus Juris citation, we find:

". . . nor need a master warn or instruct as to dangers arising from matters of common knowledge, including those arising from the well-known operation of natural forces."

In the *Props* case, plaintiff was injured when he fired a boiler with sawdust and shavings and it backfired and exploded. This court held that the danger was an obvious one, "springing from simple, natural and universal laws," and imposed on the servant the responsibility of notice, and "there was no duty upon the appellant to warn him of such laws."

In the Iowa case the plaintiff was injured while handling ice buckets and standing close to a platform. The court said:

"There is no duty to give notice of self-evident things; to advise another of what he must know, if he use his senses and ordinary reasoning power."

 While it is true that respondent had not worked in a hop kiln before, he had had some experience with hops and had spent many years working on farms. His experience must have taught him to care for himself while engaged in various farm activities. It could not but have been apparent to him in the course of the ten or sixteen trips which he made from the drying room to the bins and return that there was a considerable quantity of loose leaves upon the walk or tramway, and that they, like straw or grain, made the walk slippery. The evidence is confusing whether

the lupulin from the hops made the walk sticky or slippery, but, regardless of that fact, respondent was charged with notice of the condition which he had assisted in bringing about upon the walk. The tramway, the manner in which it was constructed, its height from the floor below, the burlap and the way in which it was fastened to the west side of the walk, the piling of loose hops against the burlap, causing it to bulge, the fact that loose hops were upon the tramway, were things which the respondent saw. The dangers incident to his task were open, obvious, and evident, and were assumed by him. If respondent was too far to the west of the center line of the walk when he stumbled, his position there was due to his own carelessness or momentary forgetfulness. There can be no doubt that he did not pay any attention to the walk piling up with loose leaves and forgot that he must watch the side of the walk and where he was walking. This is not an excuse. *Johnson v. Coates Logging Co.,* 50 Wash. 679, 97 Pac. 801; *Jacobs v. Southern R. Co.,* 241 U. S. 229, 60 L. Ed. 970, 36 S. Ct. 588; *Grand Trunk Western R. Co. v. Reid,* 42 F. (2d) 403; *Cronin v. Columbian Mfg. Co.,* 75 N. H. 319, 74 Atl. 180, 29 L. R. A. (N.S.) 111.

He cannot say that he forgot or did not pay any attention to the danger and then recover for personal injuries caused by his own neglect and forgetfulness.

The judgment is reversed, with instructions to dismiss the action.

BEALS, STEINERT, ROBINSON, and JEFFERS, JJ., concur.

GRADY, J. (dissenting)—I am unable to concur in this opinion. A correct statement of the evidence has been made, and the authorities cited lay down and adopt the rules of law as stated in the opinion. The guiding rules which must be observed by this court when reviewing an order denying a motion for nonsuit or for judgment notwithstanding the verdict of the jury are

also correctly stated. That which moves me to voice this dissent is my feeling, as I read the opinion, that the court is not applying these rules, but is approaching the case from the standpoint of a trier of fact. As the opinion is based upon the question of assumption of risk and contributory negligence, I assume that the question of whether the appellant furnished the respondent with a reasonably safe place to work is regarded either as being foreclosed by the verdict of the jury or it is assumed, without deciding, that the appellant failed to do so. I shall therefore not discuss this question.

When one approaches the question of whether an employee has assumed the risk of the dangers incident to his employment, he must take the dangers as they are disclosed by the evidence, and then draw a conclusion of fact, not one of law, therefrom as to whether they are ordinary dangers incident to the employment or are open and apparent to one who uses his senses. As to whether they are such is a matter of opinion to be formed by the jurors, and such an opinion then ripens into the ultimate conclusion.

As a guide to the formation of the opinion and the drawing of the conclusion, the jurors should be informed by the court as to the rules of law set forth in the majority opinion. The dangers connected with the use of the place furnished respondent to work, as portrayed by the evidence referred to in the opinion, very clearly show a substantial element of hazard; and the jurors had not only the exclusive right to determine whether the dangers were ordinary ones incident to the employment or were so open and apparent that one using his senses should have been aware of them, but were also in a much better position to do so, and to form an opinion thereon, than are we viewing the case from the printed record. I think, when the statement is made by this court that the respondent assumed the risk of the dangers involved here, we are forming

an opinion of our own and a conclusion based thereon which our concept of the facts leads us to form, and, in so doing, we invade the province of the jury.

If this were a case where the respondent alleged that there were certain dangers connected with the place furnished him to work, and, at the trial, proved by his own evidence that no such dangers were present, or that he saw and appreciated them, then there would be no basis for the formation of an opinion by the jury on the subject, and his case would automatically fail. But here, the dangers were established by the evidence and furnished the basis for an opinion, one way or the other, as to whether they were incident to the employment or were open and apparent; and, when such an opinion was formed, the conclusion then to be drawn should be guided by the rules of law given by the court. If this case were here for trial *de novo,* or were I the trier of fact, I should be of the opinion from all the evidence that the risks connected with the place furnished to work were incident to the work being done and were all sufficiently open and so obvious that the respondent should have been aware of them; but, as I am only reviewing the record and am confronted with the opposite opinion of the jury and the view of the trial judge, who, having the same advantage as did the jurors, believed there was the basis for an opinion and a conclusion to be formed and drawn by the jury, I find that I must lay aside my concept of the factual situation and conclude that the decision of the questions involved should be arrived at by the jury.

I am also of the same view as to the question of the contributory negligence of the respondent.

Unless we approach the questions raised on motions for nonsuits, directed verdicts, and motions for judgments notwithstanding the verdicts from the foregoing angle, we shall find ourselves unconsciously reaching a conclusion based upon our concept of the facts,

rather than doing so only when the affirmative evidence of the plaintiff either wholly disproves his cause of action or establishes a defense thereto, and when the conclusion that such is the case is a legal conclusion and not a factual one.

The judgment should be affirmed.

MILLARD, BLAKE, and MALLERY, JJ., concur with GRADY, J.

